## In re Village of Morrisville Water and Light Department

[365 A.2d 525]

No. 187-75

Present: Barney, C.J., Smith, Daley, Larrow and Billings, JJ.

Opinion Filed September 17, 1976

*Leslie C. Pratt* of *Paterson, Gibson, Noble & Brownell,* Montpelier, for Plaintiff.

*Gary H. Barnes* of *Downs, Rachlin & Martin,* St. Johnsbury, for Eastern Magnesia Talc Company.

**Larrow, J.** Eastern Magnesia Talc Co., claiming special status as a contract customer of the Village of Morrisville Water and Light Department, has appealed from the Findings and Order of the Public Service Board dated June 16, 1975, granting that Department an overall 37.7% increase in its base rates. The order was expressly made applicable to the appellant.

Pursuant to V.R.A.P. 13(d) the Board has certified to us nine questions for appellate review. We will not recite them all at length, because some of them are conditioned on answers other than those herein contained.

Question No. 1 is as follows:

1. Did the Public Service Board err in finding that the evidence was insufficient to establish a lawful "contract for a definite term" within the meaning of 30 V.S.A. Section 229?

Questions 2, 3 and 4 relate to interpretation of such a contract, if Question No. 1 is answered affirmatively, and to power of the Board to change a rate specified therein. These questions become immaterial in light of the negative answer to Question No. 1 hereinafter contained.

Question No. 5 is as follows:

5. Was EMT afforded adequate notice of the proceedings to change its "contract" rates, sufficient to satisfy the notice requirements of the laws of the United States and Vermont?

Questions 6, 7, and 8 are predicated upon a negative answer to No. 5. They become immaterial in light of our affirmative answer hereinafter contained.

Question No. 9 is as follows:

9. Was the evidence sufficient to sustain the findings of fact and conclusions of law of the Public Service Board relating to the new level of rates set for EMT?

Like most rate cases, a simple recital of the facts involved verges on the impossible. The ones pertinent to the issues here presented we will attempt to outline.

On January 1, 1972, a contract previously in effect between appellant and Morrisville expired by its terms. Shortly thereafter, Morrisville filed proposed new rate schedules with the Board, encompassing its various filed rates but not those previously in force with appellant. On October 12, 1972, the Board ordered a revised filing, specifying that "the revised rate schedules should also include a rate schedule or contract with the Eastern Magnesia Talc Company." Subsequently, in October, 1973, the parties executed a new contract, purporting to commence, retroactively, January 1, 1973. Morrisville forwarded this contract to the Board, by letter received October 17, 1973. No proceedings were taken with respect to it. About a week later, Morrisville filed its new rate schedules, again without reference to appellant. The contract differed from usual rate schedules in that it provided for (a) furnishing service outside Morrisville's usual service area (b) a maximum rate of taking, from surplus energy generated or purchased (c) a delivery at 34,400 volts, 3 phase, 60 cycles (d) discounts for metering equipment and transformer ownership (e) 15 minute peak demand charges, and (f) a three year term, automatically extended, terminable after three years on six months' notice.

Public notice of the changes was given November 5, 1973. On November 23, the Board suspended the changes and ordered an investigation into their reasonableness under 30 V.S.A. § 226. By order dated April 15, 1974, a temporary increase was granted Morrisville, following a February 28 hearing. On appellant's April 3 bill was a notice that it was a tentative invoice, subject to adjustment for the expected order. The 13.9% temporary increase authorized was billed to appellant, above its claimed "contract rate", and paid under protest.

Appellant's general manager appeared at a November 14, 1974, hearing and testified about the claimed contract. He was given the prefiled testimony and exhibits. Thereafter, appellant intervened, appearing only for the limited purpose of contesting the validity of applying any rate increase to it. By written brief, it argued the Board lacked authority to change the written contract, that procedural difficulties precluded such change, and that the evidence was insufficient to warrant rescission. Following a hearing, and an "update hearing," the

Board ruled that the contract contemplated modification by the Board, that even if it did not the Board had legal authority to change the contract rates, that appellant had been provided with adequate notice, and that the increased cost of service attributable to appellant justified an increase in its rates. A recoupment surcharge under 30 V.S.A. § 226(b) was authorized as to all customers. The instant appeal resulted.

The gravamen of the appeal before us is that the agreement dated as of January 1, 1973, is a valid, enforceable obligation under Vermont law, creating a fixed rate, and that it does not contemplate modification by the Public Service Board. Appellant claims that without any agreement as to modification, the Board has no statutory authority to modify, under 30 V.S.A. § 229. Appellant argues further that even if there is such authority, it had insufficient notice, that the proof was insufficient, that it should be refunded the amounts it paid under protest as a temporary increase, and that retroactive recoupment should not be allowed against it.

30 V.S.A. § 229 deals generally with the prohibition of special rates, rebates and the like by a public utility. Without quoting it in full, it contains two exceptions which are here pertinent. They read as follows:

> . . . No public service company may enter into any contract, agreement or arrangement relating to the furnishing or rendering of any special product or special service not provided for or covered in the schedule without the prior approval of the board.
> . . . Subject to the approval of the board, it shall be lawful for any public utility to make a contract for a definite term for its product or service.

Both Morrisville and the appellant, as well as the Board, seem to regard the agreement in question as within the quoted provision relating to contracts for a definite term, subject to board approval, although appellant argues that it had Board "approval" prior to its execution because of the Board's order of October 12, 1972, requiring Morrisville to file revised schedules, including a new schedule or contract with the appellant. Nothing in that order required or even suggested that such contract be for a stated term, and we are unable to concur with appellant's contention that the general direction con-

tained in the order was a blanket approval for whatever contract was to be submitted. We cannot strain the literal meaning of "approval" to include a prior uninformed endorsement of whatever terms the parties may arrive at, or to mean unlimited authority to contract at will. Only by such interpretation could the mandate of the 1972 order be construed as "approval".

Nor can we accept appellant's contention that, absent formal approval or disapproval, the Board will be deemed to have approved the contract. The record amply demonstrates that the Board considered the contract terms as encompassed within the ongoing rate schedule review. But beyond this, we are of the view that despite being for a term arguably definite, the proposed agreement is governed by the statutory provision quoted relating to the furnishing of a special product or special service not provided for in the rate schedules, and thus requiring *prior* approval of the Board. As we have indicated, the agreement related to the sale of surplus power, outside the village limits, at high voltage, and upon other terms not common to ordinary service. It renewed automatically unless terminated. As found, appellant used about 19% of Morrisville's total sales. All these factors render the contemplated service a special one within the meaning of the statute, and not just the furnishing of regular service for a specified term, such as might be required for uncommon line extension or right-of-way investment. There was no such prior approval, and hence no valid enforceable contract in effect at any time. To hold otherwise would be virtually compelling the Board to abdicate its function of regulation in the public interest. Construing a direction to negotiate a new rate as approval of that rate, whatever it might be, would render the statutory requirement of prior approval completely nugatory.

We have, therefore, answered the first certified question in the negative, interpreting the error therein referred to as meaning harmful error. The Board concluded there was no valid contract, because there had been no Board approval as required for a contract for a definite term, and because the contract terms, in addition, contemplated Board revision. While we disagree, regarding the proposed agreement as one for special services requiring *prior* Board approval, the net

result is the same. There was no valid existing contract between the parties which the Board was bound to honor, and no prejudicial error appears.

Question No. 5, and the second issue of which we treat, deals with the appellant's claim of inadequate notice of the proceedings below. It claims, without any showing of resulting prejudice, that the published public notice referred only to increases in Morrisville's electric rate schedules, and that since its agreement was not a "schedule" the notice did not encompass any revision in the contract provisions. Completely apart from the consideration that review of any proposed schedule necessarily involves consideration of other rates to ascertain overall equity of charges, many other facts appearing of record militate against appellant's contention. It was charged the temporary increase when it went into effect, and advised of it on the prior bill. Its manager appeared and testified at the November 14, 1974, hearing, stating the counsel had been employed and consulted since May, 1974. On December 29, 1974, it filed a motion to intervene. At the March 25, 1975, hearing its counsel specifically indicated that he did not "anticipate litigating the proposals for a rate increase". He also stated:

> . . . I would like to put a comment on the record, if I may. Since this is the first appearance of Eastern Magnesia Talc as a party to this proceeding since the Board's last order, I would like to put on the record that Eastern Magnesia Talc is appearing for the limited purpose only of contesting the validity of applying any rate increase to Eastern Magnesia Talc Company.

This specific point was briefed, argued and decided below, with appellant's full participation.

In the field of administrative regulation the essentials of due process must be met if a fair and open hearing is to be provided by the Board. . . . The question on review is not the adequacy of the original notice or pleading but is the fairness of the whole procedure. Critical to a determination of whether the procedure was fair is whether or not the parties were given an adequate opportunity to

prepare and respond to the issues raised in the proceeding. (Citations omitted.)

*Petition of Green Mountain Power Corporation,* 131 Vt. 284, 293, 305 A.2d 571 (1973). The record viewed as a whole clearly demonstrates that the test of "fairness of the whole procedure" was completely met. A formal notice to all the parties might have been preferable as soon as it became apparent the appellant's rates were actually involved, but we cannot say that appellant was deprived of any opportunity to be heard, particularly when it appeared only for a specific purpose and sought no other participation. *Petition of Green Mountain Power Corporation, supra,* at 294. That it did not examine or present witnesses, or seek determination of any issue except the validity and controlling nature of its contract, was its own choice. It was not denied participation on other issues; it sought no continuance on any ground. No unfairness in the procedure below is made to appear.

Question No. 9 addresses itself to the sufficiency of the evidence below to support the new level of rates set for appellant. In its brief, appellant does not address itself to the evidence supporting a rate increase generally, but to the legal issue of whether it was established that the public interest required a change in its contract rate. The complete answer to this issue is contained in our discussion of the purported contract, *supra.* There was no existing valid contract in force with the appellant; the sufficiency of evidence to change such a contract, had there been one, is moot.

■ Any possible issue regarding the appropriateness of assessing appellant the temporary increase, and the recoupment authorized, is also disposed of by the discussion, *supra,* of the adequacy of notice to it of the issues involved. At all times it chose to confine itself to the issue of the validity and governing nature of its proposed contract. It seeks now to raise here, for the first time, issues it did not press below. Since these issues lack constitutional dimension, we do not consider them for the first time on appeal. *In re Maher,* 132 Vt. 560, 562, 326 A.2d 142 (1974).

■ Moreover, recoupment is a right inherent in the right to a rate increase which is postponed by litigation, and

the right to the increase, generally, is not challenged by the appellant. It was found by the Board, and is unchallenged. The language of Mr. Chief Justice Barney in *In re Allied Power and Light Co.*, 133 Vt. 586, 592, 350 A.2d 360 (1975) is most appropriate:

> The appellants also challenge the right of the utilities to recoup rate increases forestalled by litigation. The claim that this is somehow the recovery of damages cannot be sustained. We view the interruption of the recovery of these increases as part of a single, uninterrupted litigation and hold that the Board's determination that the utilities concerned have shown a right to the rate relief so long in the accomplishment is full authority for the granting of that relief now. To hold otherwise would be both unfair and contrary to the policy in these cases that declares in a utility a right to those rates which are determined to be just and reasonable, and permit a fair return. (Citation omitted.)

The Board below placed its reliance upon legal grounds, without comment on the inherent equities arising from the actions of the parties. And indeed, execution of the purported contract by the Village leaves its participation here somewhat lacking in the vigor usually demonstrated by an outraged party. It seems, however, quite transparently clear that the long delay in executing the purported agreement, the provision making it retroactive for some nine months, and the manner of its casual submission to the Board, indicate an intent on the part of the parties to put a "special" rate into effect without consideration of the other ratepayers. 30 V.S.A. §§ 208, 209, 218, 219, and 229, viewed together, gave the Board ample authority to thwart such an objective, and it quite properly did so.

Certified Question No. 1 is answered in the negative. Certified Questions No. 5 and No. 9 are answered in the affirmative. In light of these answers, the other certified questions are rendered immaterial.

*The order of the Public Service Board is affirmed.*