PUBLIC SERVICE COMMISSION,
Appellee-Appellant/Cross-Appellee,

v.

DIAMOND STATE TELEPHONE
COMPANY,
Appellant-Appellee/Cross-Appellant.

Supreme Court of Delaware.

Submitted: June 6, 1983.

Decided: Nov. 2, 1983.

William D. Bailey, Jr., Wilmington, for appellee-appellant/cross-appellee.

Richard L. Sutton (argued) and Lawrence A. Hamermesh of Morris, Nichols, Arsht & Tunnell, Wilmington, for appellant-appellee/cross-appellant.

Before HORSEY and MOORE, JJ., and LONGOBARDI, Vice Chancellor.

HORSEY, Justice:

The Public Service Commission (the Commission) appeals an interlocutory Order of the Superior Court dated November 5, 1982; and Diamond State Telephone Company (Telephone Co.) cross-appeals from the same Order. The Court accepted the interlocutory appeal on January 3, 1983. The appeals concern the Commission's general rate Order of October 8, 1981 (the "1981 Order"); Telephone Co.'s appeal of such Order to Superior Court; and Superior Court's reversal of the Commission's 1981 Order by Opinion dated August 12, 1982, unreported.

Two questions are raised by the appeal and one by the cross-appeal:

(1) Did the Commission's 1981 Order improperly deny Telephone Co. a current fair return on a portion of its investment by deferring, if not removing, from Telephone Co.'s rate base its pre-1981 unamortized "inside wiring" investment of $21.8 million?

(2) Did the Commission's 1981 Order improperly disallow Telephone Co. nearly $806,000 of license contract expenses for Telephone Co.'s refusal to produce certain documents for inspection by the Public Advocate's expert witness or for failure of Telephone Co. to meet its burden of proof of such expenses?

(3) Did Superior Court err in rejecting Telephone Co.'s application that the Court's favorable ruling in August 1982 be given retroactive effect to the date of the Commission's Order in October, 1981?

With respect to question # (1), we answer it in the affirmative and affirm Superior Court's ruling. We hold that Telephone Co. was entitled to include the unamortized balance of its pre-1981 inside wiring investment in its rate base until fully amortized over the next ten years.

With respect to question # (2), Superior Court concluded that the expense disallowance was "meant to be a sanction" for failure of Telephone Co. to make discovery. The Court then found the sanction to have been arbitrarily imposed. However, we find the present record inadequate to determine whether the Commission's disallowance was imposed as a discovery sanction against Telephone Co. or for failure of Telephone Co. to prove the validity of such expenses. Hence, we reverse Superior Court's ruling on the question and remand this issue to the Commission to make explicit its basis for disallowance of the contract expense item, with jurisdiction reserved.

With respect to the cross appeal and question # (3), we affirm Superior Court's refusal to impose a temporary rate sur-

charge to enable Telephone Co. to recoup revenues lost from the erroneous Commission rulings. To grant such relief would involve the Court in retrospective rate-making without a clear legislative mandate—particularly in view of the relief otherwise available to Telephone Co. under 26 *Del.C.* § 511 (see footnote 18).

## I

■ Of the three questions raised, the central issue relates to the proper treatment for accounting purposes of unamortized "inside wiring" costs incurred by Telephone Co. before January 1, 1981.[1]

Until 1981, all station connection expenses, including inside wiring costs, were traditionally capitalized and included in a utility's rate base. However, the Federal Communications Commission (FCC) on

March 31, 1981 changed the accounting for the inside wiring component of station connections costs to require that all *new* expenditures for inside wiring be accounted for, for FCC purposes, as operating expenses either in the year incurred or, at the utility's option, partially taken over a four-year phase-in approach.[2]

The rationale for the FCC's accounting change in telephone utilities' treatment of inside wiring costs was: (a) the extraordinary growth in such costs in recent years; and (b) belief that the burden of such costs should fall on the "immediate cost causative customer" and not be shifted in later years by an annual charge for depreciation or amortization until fully amortized.[3]

In compliance with the FCC Order, Telephone Co. amended a petition then pending

---

1. "Inside wiring" costs are those incurred by a utility inside a customer's premises for installing wiring between the telephone and the premises' exterior. Inside wiring costs are a component of "station connection" costs that also include outside wiring (technically referred to as "drop and block" facilities) connecting a customer's premises with the telephone line at the street. Station connection expenses, including inside wiring component costs, are commonly referred to as Account # 232 expenses.

2. Under the alternative phase-in approach, each year an increasing percentage of inside wiring costs would be treated as an expense, *i.e.,* 25% in the first year, 50% in the second year, 75% in the third year and 100% by 1984 and thereafter. The FCC's accounting change for expensing inside wiring costs was not extended to outside or "drop and block" wiring portion of the station connection costs. Such outside costs were permitted to be continued to be capitalized on the reasoning that such equipment had a service life of many years whereas inside wiring is subject to more frequent change according to customer whim and change of ownership of property.

3. In its Order released March 31, 1981, the FCC stated, in part: ". . . the amount capitalized in account 232 is continuing to grow at an extraordinary rate in comparison with growth in other investment categories. This growth, even for a short period of time, cannot continue unchecked. Our primary objective [is] to have these costs borne by the immediate cost causative customer. At first glance, we believed that

expensing would accomplish this goal. However, our analysis in this proceeding has indicated that expensing alone would not accomplish this. Rather, it would only assure that the burden was placed on all customers at the time the expenditures were made (as opposed to present and future customers when the costs are capitalized). Expensing, coupled with appropriate tariff action by the state commissions, would, for the most part, impose these costs on the cost causative customer. Thus, while our ultimate goal is to see that this burden is placed on the cost causative customer, the continued strict adherence to full capitalization will continue to permit this problem to grow. This is a situation which we believe is unacceptable.

Given the foregoing, it is our opinion that a reasonable step to ameliorate this problem is to require all subject carriers to expense to account 605, 'Installations and repairs of station equipment,' the inside wiring portion of station connections effective October 1, 1981 [subject to the above-mentioned four-year phase-in of an increasing percentage of the annual costs as an expense item." [footnote omitted]. Order of the Federal Communications Commission, released March 31, 1981, ¶¶ 33, 34 entered in *In the Matter of Amendment of Part 31, Uniform System of Accounts for Class A and Class B Telephone Companies, of the Commission's Rules and Regulations with respect to accounting for station connections, optional payment plan revenues and related capital costs, customer provided equipment and sale of terminal equipment.* FCC Docket No. 79–105.

before the Commission for a general rate increase to request the Commission's approval of the following accounting changes: (1) to expense its *post*-1980 inside wiring expenses on the four-year phase-in basis allowed by the FCC; (2) to continue to capitalize its *post*-1980 drop and block expenses in accordance with the FCC ruling; and (3) to continue to amortize its unamortized pre-1981 inside wiring expenses until fully amortized—presumably over the next 10 years.

By Order dated October 8, 1981, the Commission approved (1) and (2) but disapproved (3). The Commission's disapproval of the Telephone Co.'s request (3) was based on the Commission's staff recommendation that Telephone Co.'s remaining pre-1981 unamortized investment in inside wiring be *removed* from Telephone Co.'s rate base. The item was carried on Telephone Co.'s books at $21,045,000 and represented more than 11% of Telephone Co.'s entire rate base.

Telephone Co. challenged the removal of the embedded inside wiring cost from its rate base as being a denial of a current return on its investment in "plant used and useful", and contrary to 26 *Del.C.* § 102(3)a and b.[4] The Commission responded by finding "that the change of treatment of these expenditures from capitalization to expense (as *advocated* by [Telephone Co.]) changes

their nature to an expense item for *all* purposes." (underlining added). The Commission then tersely concluded, "Rate base treatment of an expense item would be inappropriate."

On appeal of this issue to Superior Court, the Court reversed the Commission. The Court interpreted the Commission's "special treatment"[5] of Telephone Co.'s pre-1981 inside wiring investment as *deferring* Telephone Co.'s return on its investment rather than as *excluding* the investment from its rate base. However, the Court found that the Commission's deferral of revenue technique deprived Telephone Co. of a fair return on its investment over at least the first five years of the ten year amortization period for the investment.[6] The Court added that the Commission had a simple mechanism for addressing its concerns with the "theoretical possibility of excessive earnings [by Telephone Co.] on [its inside wiring] investment in the future." The Commission could always monitor "the effects of the new rate and [simply] initiat[e] a reduction of rates, if appropriate, as authorized by statute. 26 *Del.C.* §§ 309, 310." We affirm Superior Court's ruling on this issue.

The scope and standard of review of an appeal from the Commission's Order is as set forth in 26 *Del.C.* § 510(b) and (c) which provide:

**4.** 26 *Del.C.* § 102(3)a and b state in part as follows:

"Rate base" means:

a. The original cost of all used and useful utility plant and intangible assets either to the first person who committed said plant or assets to public use or, at the option of the Commission, the first recorded book cost of said plant or assets; less;

b. Related accumulated depreciation and amortization; less...."

**5.** To "compensate" Telephone Co. for the removal of its inside wiring investment from Telephone Co.'s rate base, the Commission authorized the accrual of a special capitalization rate of 12.68% on the excluded sum. However, the Commission then deferred Telephone Co.'s recovery of the accrual and made it contingent upon an involved review procedure. Under this procedure, Telephone Co. would be re-

quired to petition the Commission through a so-called "re-opener" proceeding each year for recovery of the accrued interest and also demonstrate, to the Commission's satisfaction, "that the filed rate increase will not produce a rate of return during the ensuing year in excess of that last allowed by the Commission." Telephone Co. viewed, with some justification, the proposed "re-opener" procedure as necessarily requiring it to submit not only to an annual examination of its rate base but also to a review of its overall current revenues and expenses and not merely to a review of its inside wiring account return.

**6.** According to the unrebutted testimony of Telephone Co.'s expert witness, under the Commission's deferral approach, Telephone Co.'s revenue would be reduced by nearly $5 million in the first year and by over $13.2 million in the first five years.

(b) The appeal shall not be a trial de novo but shall be based upon the record before the Commission.

(c) The scope of review before the Court shall be that the Commission's findings shall be upheld if they are supported by sufficient evidence, free of error of law and not arbitrary or capricious. When factual issues are reviewed the Court shall take due account of the presumption of official regularity and the quasi-legislative function and specialized competence of the Commission.

### A.

The first question we must focus on is whether Telephone Co.'s embedded unamortized inside wiring costs qualified for inclusion in Telephone Co.'s rate base under 26 *Del.C.* § 102(3)a as "used and useful utility plant." The question arises only because rate counsel on appeal argues that the Commission properly excluded this item from Telephone Co.'s rate base for failure of inside wiring to qualify as "plant" under 26 *Del.C.* § 102(3)a. The argument fails for several reasons. *First,* the Commission's exclusion ruling was not based on a finding that Telephone Co.'s embedded inside wiring did not qualify as "plant" under § 102(3)a. *Second,* the facts and the law clearly support the contrary—the inclusion of Telephone Co.'s previously incurred inside wiring costs in its rate base until fully amortized.

The critical language of the Commission's decision that the parties focus on and variously interpret is the following:

The Applicant [Telephone Co.] has challenged the removal of the embedded cost from the rate base as being a denial of a return on plant used and useful. We find that the change of treatment of these expenditures from capitalization to expense (as advocated by Applicant) changes their nature to an expense item for all purposes. Rate base treatment of an expense item would be inappropriate.

Rate counsel interprets the Commission as thereby stating that, "the true nature of this accumulation was expense not plant and thus the inclusion in rate base inappropriate." We disagree.

The Commission's rationale for excluding Telephone Co.'s embedded inside wiring costs from its rate base cannot be reasonably attributed to an asserted failure of such costs to qualify for inclusion in rate base as "used and useful utility plant" under § 102(3)a. We interpret the Commission's exclusion of Telephone Co.'s inside wiring investment from its rate base as directly and solely attributable to the FCC's accounting "change of treatment" of inside wiring costs from capitalization to expense. The Commission's above-quoted ruling may be paraphrased as stating:

We find that the FCC change of treatment of inside wiring expenditures from capitalization to expense (and Applicant's adoption of such accounting changes) requires changing Telephone Co.'s treatment to an expense item for past as well as future expenditures. Since inside wiring expenses will be henceforth treated as an expense item [subject to phase-in option], all previously incurred and unamortized inside wiring costs should also be removed from Telephone Co.'s rate base.

Indeed, the Commission's conclusion "that the change of treatment of these expenditures from capitalization to expense..." implicitly assumes that inside wiring costs previously qualified for inclusion in rate base under § 102(3)a. And the uncontradicted record evidence before the Commission was that Telephone Co.'s unamortized inside wiring expenses represented "used and useful utility plant" that qualified for inclusion in its rate base. Further, by approving Telephone Co.'s application # (1) and # (2) referred to above [to expense post-1980 inside wiring expenses on the four-year phase-in basis allowed by the FCC; and to continue to capitalize its post-1980 drop and block portion of its station connection expenses] the Commission necessarily recognized inside wiring expenses—both past and future—as properly includable in rate base under § 102(3)a.

Moreover, it cannot be seriously argued that Telephone Co.'s $21.045 million of inside wiring costs were not reasonably necessary for the provision of telephone service to the public. General principles of utility law recognize that the " 'used and useful' standard requires that the plant included in rate base be reasonably necessary to the efficient and reliable provision of utility service to the public." *L.S. Ayres & Co. v. Indianapolis Power & Light Co.,* Ind.App., 169 Ind.App. 652, 351 N.E.2d 814, 833 (1976).[7]

Finally, rate counsel's argument that inside wiring does not qualify for "plant" because it consists primarily of labor costs is not persuasive. The record does not disclose any explicit percentage division of inside wiring between labor and material. Nor is there evidence of any recent dramatic increase in the labor cost component of inside wiring that would warrant a reversal of the Commission's previous inclusion of such costs as "plant" for capitalization.

### B.

We take up the Commission's two remaining grounds for excluding Telephone Co.'s pre-1981 embedded inside wiring from its rate base: (1) that unless removed, Telephone Co. "<u>might</u> be in a position to have the opportunity to earn more than its authorized rate of return on that investment <u>on an ongoing basis</u>" (underlining added for emphasis); and (2) that "the change of treatment of [inside wiring] expenditures from capitalization to expense (as advocated by [Telephone Co.]) changes their nature to an expense item <u>for all purposes</u>" (underlining added for emphasis). The Commission's first ground for exclusion was based on its staff's reasoning: that if Telephone Co.'s pre-1981 inside wiring investment

were permitted to be amortized on a ten-year basis, the account balance would be in a declining amount, in contrast to its amount as originally included in Telephone Co.'s rate base. When Telephone Co. challenged the removal of its embedded investment from its rate base as "a denial of a return on plant used and useful", the Commission responded by asserting its second ground—that Telephone Co.'s accounting change to expense its *post*-1980 inside wiring expenditures precludes further rate base inclusion of *pre*-1981 unrecovered expenditures of the same kind. The Superior Court properly found no merit in the first ground and the second ground is equally unsound.

The Commission's concern for an excessive rate of return on a declining investment is more fanciful than real. Further, it is based on speculation and conjecture without any factual foundation in the record. The same argument might be made as to any capitalized element within a utility's rate base. The Commission has done no more than pose a "theoretical possibility of excessive earnings", as Superior Court noted. Moreover, Telephone Co. established through unrebutted testimony: (1) that their investors would in fact earn less than the authorized return until at least 1984; and (2) that Telephone Co.'s actual return on investment would decline. Finally, the Commission's concern of excessive earnings "on that investment on an ongoing basis" is clearly a matter that the Commission may control through its general statutory power to monitor the effect of any authorized rate of return and, if appropriate, to initiate proceedings for a reduction of rates if, in fact, an excessive return is realized. 26 *Del.C.* §§ 302, 307(a), and 309(a).[8]

---

**7.** 26 *Del.C.* § 102(3)g recognizes this principle in providing:

"Any other element of property which, in the judgment of the Commission, is necessary to the effective operation of utility."

**8.** 26 *Del.C.* § 302 provides, in pertinent part:

"The Commission may, from time to time, ascertain and determine the rate base of any

public utility whenever, in the judgment of the Commission, it is necessary so to do for the purpose of carrying out this chapter...."
26 *Del.C.* § 307(a) provides:

"In any proceeding upon the motion of the Commission, or upon complaint, or upon application of a public utility, involving any proposed or existing rate of any public utility, or any proposed change in rates, the burden of

We turn to the Commission's finding that Telephone Co.'s decision to expense post-1980 inside wiring costs, in accord with the FCC Expensing Order, bars Telephone Co. from continuing to carry its pre-1981 unamortized inside wiring in its rate base. The Commission's only reasoning for this result is that, "the change in treatment of these expenditures from capitalization to expense ... changes their nature to an expense item for all purposes. [Ergo] Rate Base treatment of an expense item would be inappropriate." The Commission's ruling must be rejected as illogical and erroneous in fact and as a matter of law.

*First,* the Commission's reasoning is fallacious. Of course, an expenditure that is treated as an expense and chargeable against revenue cannot be simultaneously taken into rate base and capitalized; but that was never proposed by Telephone Co. Telephone Co. only sought to expense its future inside wiring costs in accord with the FCC 1981 directive and further elected the phase-in approach of continuing to capitalize on a declining basis a portion of such costs until 1984, which the Commission approved.

*Second,* the FCC Expensing Order only applies to inside wiring costs incurred after January 1, 1981 and does not decree any accounting changes as to previously-incurred inside wiring costs that have been capitalized.

*Third,* prior to the 1981 Expensing Order, inside wiring costs were traditionally capitalized by telephone utility companies by inclusion in rate base until eventually amortized. This practice was apparently not questioned by either the Commission or the FCC until the hearing which resulted in the 1981 Expensing Order.

The Commission concedes as much in asserting that its failure to object to the previous inclusion of inside wiring costs in rate base does not "prevent" the Commission from now taking a different approach as to such costs in the future. However, to expense rather than capitalize future costs of this nature, in advance of their being incurred, has quite different consequences from the Commission's action of decreeing that all previously incurred and unrecovered costs of such nature no longer qualify for inclusion in rate base. Indeed, the Commission, in fashioning its special deferral of Telephone Co.'s embedded inside wiring investment, acknowledged that its staff's initial deferral technique denied Telephone Co. a current return on investment. (See I, C, footnote 9 below).

A further basis for reversing the Commission's embedded inside wiring ruling is that on which Superior Court relied: "that the [Commission's] special treatment of the inside wiring investment in this case was error because it denies investors an opportunity of earning a fair return on the inside wiring investment." The Court thereby found that the Commission had improperly *deferred* investors' right to a current return on investment and that such deferral was tantamount to a *denial* of a right to a fair return on a significant portion of Telephone Co.'s unrecovered pre-1981 capitalized investment, $21,045,000—a sum representing 11 percent of Telephone Co.'s entire rate base. Under the deferral technique adopted by the Commission, the testimony was unrebutted that Telephone Co. "would receive $4,959,000 less revenue in the first year and $13,241,000 less in the first five years." On the basis of this unrefuted testimony, the Court reasoned:

> [The Commission plan] does not provide the additional revenue needed during the first five years of the amortization period to allow for a fair return on the inside wiring investment which will not be recovered as an expense. In short, the Commission improperly avoided the theo-

proof to show that the rate involved is just and reasonable is upon the public utility."

26 *Del.C.* § 309(a) provides, in pertinent part:
"The Commission may, after hearing, upon notice, by order in writing, fix just and reasona-

ble individual rates ... whenever the Commission determines any existing individual rate ... to be unjust, unreasonable...."

retical possibility of excessive earnings on this investment in the future by depriving investors of the opportunity of earning a fair return during the first five years that the new rates would be in effect, instead of dealing with its concern by monitoring the effect of the new rates and initiating a reduction of rates, if appropriate, as authorized by statute. 26 *Del.C.* §§ 309, 310.

We adopt Superior Court's reasoning and result, in part for reasons hereafter stated.

### C.

We turn to the Commission's alternate argument which assumes, in part, our rulings under A and B: Even if Telephone Co.'s embedded inside wiring qualified for inclusion in its rate base, the Commission has the power to defer a utility's return on a portion of its rate base in appropriate circumstances; and under the circumstances of this case, deferral was in the public interest. The Commission thereby asserts a discretionary authority to defer a utility's approved rate of return on a portion (if not all) of its investment notwithstanding its inclusion in the utility's rate base.

The Commission's standing to raise this argument on appeal is doubtful under Rule 8.[9] In its ruling below, the Commission did not speak in terms of its having a power to defer a utility's legitimate return on an acknowledged portion of its rate base. Rather, the Commission, in a two-step process, first excluded Telephone Co.'s embedded inside wiring from its rate base solely on the basis of its finding that the FCC accounting change as to post-1980 inside wiring expenditures, and Telephone Co.'s adoption thereof, "changes their nature to an expense item for all purposes. Rate Base treatment of an expense item would be inappropriate." But, the Commission *acknowledged* the merit of Telephone Co.'s objection to its expensing recommendation as improperly deferring a return on a significant rate base item; and the Commission conceded, in effect, that deferral was inappropriate.[10] The Commission *then* fashioned its so-called annual reopener proceeding as an answer to the deferral argument. Thus, the ruling prompting this appeal is not premised (explicitly or implicitly) on the Commission's having power to defer a utility's return on its rate base; nor did Superior Court address the Commission's power to defer a return in reversing the Commission.

However, apart from the Commission's power to defer argument being untimely raised because not articulated below, we find no statutory authority in the Commission to defer any portion of a utility's legitimate return upon a recognized portion of its rate base.

The Commission's argument to justify a power to defer an approved return on a recognized rate base item attempts to bridge jurisdictional voids with an "end justifies the means" argument. The Commission argues that by virtue of its ultimate power under 26 *Del.C.* § 311[11] to determine

---

**9.** Supreme Court Rule 8 provides:

"Only questions fairly presented to the trial court may be presented for review; provided, however, that when the interests of justice so require, the Court may consider and determine any question not so presented."

**10.** The Commission so stated as follows:

"We also recognize [Telephone Co.'s] concern that this treatment for expensing of Station Connection results in the deferral of the return on the embedded inside wiring investment to future years. We will therefore implement a review procedure developed to address this matter. Under this procedure, [Telephone Co.] will be entitled in any year in which it does not have a pending general rate case to file new rates [for] each year of the amortization period. These new rates will be designed to recover the increase in [Telephone Co.'s] revenue requirement occasioned by the expensing of Station Connections under the approach which we have adopted."

**11.** 26 *Del.C.* § 311 provides in pertinent part:

"If, after hearing, the Commission finds any existing or proposed rate unjust, unreasonable or unjustly discriminatory, or in any wise in violation of law, the Commission shall determine the just and reasonable rate to be charged or applied by the utility ... and such rate shall thereafter be observed until changed, as provided in this chapter."

the just and reasonable rate that a utility may charge, an unlimited discretionary power is conferred upon the Commission over all elements affecting rates. In the Commission's words, "[d]etermination of revenues, expenses, rate base and rate of return [while] important ... are but way stations on the route to the setting of the just and reasonable rates that the statute mandates." From this reasoning, the Commission concludes that subsumed within its power to control rates is a power to defer a return. However, the Commission then confines its deferral power to only a "portion"—not all—of a utility's plant qualifying for rate base treatment (in this case, Telephone Co.'s embedded inside wiring investment); and the Commission then further limits its power to defer a return to "appropriate" or "exceptional" circumstances.[12]

We cannot find within § 311, or indeed within any of the "jurisdiction and powers" provisions of subchapter II of Title 26, any grant to the Commission of power to defer an approved return on a recognized component of a utility's rate base. Nothing this Court said in *Application of Wilmington Suburban Water Corp.*, Del.Supr., 211 A.2d 602 (1965), can be reasonably construed as recognizing, or even implying, such a power in the Commission.[13] On the contrary, in *Suburban,* we emphasized the ultimate consideration in determining the correctness of a rate of return to be "that the utility be permitted to earn enough to operate in a manner fair to it and to the consuming public." That, in turn, requires the Commission to take into consideration: the utility's rate base as valued under 26 *Del.C.* § 102(3)a; dollars required for the utility to operate; and "the fair rate of return a utility may be permitted to earn on [the

determined value] of its properties." 211 A.2d 608. In our view, a deferral of a return on any element of a rate base is tantamount to a denial of a fair rate of return and impermissible where shown, as here, to substantially reduce revenue.

The Commission's power to defer argument is also factually unsound: that its special treatment of Telephone Co.'s pre-1981 inside wiring investment is justified, in any event, by "the extraordinary circumstances in which this issue arose" and the "unusual constellation of events" caused by the FCC's Expensing Order on inside wiring. The FCC Expensing Order of 1981 did not convert pre-1981 unrecovered inside wiring investment of telephone utilities into an expense item or, indeed, affect past expenditures for inside wiring costs in any way. The FCC Order only applied to inside wiring expenditures from January 1, 1981 forward; and as to such future expenses, the FCC still permitted a four-year phase-in conversion from capitalization to expensing. All pre-1981 inside wiring expenditures by telephone companies, together with all future expenditures before 1984 that are not expensed under the phase-in approach, are to be continued to be treated for FCC accounting purposes as capital investment in "telephone plant in service" and amortized over ten years. 47 C.F.R. §§ 31.100:1, 31.232.

Thus, there is no factual basis for the Commission's assertion that the FCC's 1981 Expensing Order constituted circumstances sufficient to justify the Commission's action taken with respect to Telephone Co.'s embedded inside wiring investment. Hence, the Commission's ruling that Telephone Co.'s change in treatment of its inside wiring expenses in the future "changes their

---

12. The degree to which rate counsel qualifies the Commission's purported power suggests serious problems in defining the limits of such a power and counsel's recognition thereof.

13. *Chesapeake & Potomac Tel. Co. v. Public Serv. Com'n*, D.C.App., 330 A.2d 236 (1974)

permitted the deferral of new utility rates from becoming effective pending final action of the Public Service Commission. The Court was not concerned with the issue here raised of a commission's power to defer a return on a commission's final rate order.

nature to an expense item for all purposes" is clearly erroneous as a matter of fact.[14]

The Commission's "special treatment" of Telephone Co.'s embedded inside wiring investment appears to have been motivated by the Commission's realization that future expensing of inside wiring costs would produce a significant increase in Telephone Co.'s needs, requiring a rate increase that would be "too severe on ratepayers." Thus, the Commission's deferral of Telephone Co.'s return on its embedded inside wiring investment must be taken for what it was, an effort to reduce the impact of these new revenue requirements on the telephone-using public. So viewed, the Commission's deferral of Telephone Co.'s return would have precisely the opposite effect from that intended by the FCC's Expensing Order—that the current cost-causative customers of inside wiring costs bear the cost thereof rather than having such costs capitalized and recovered from future customers.[15]

## II

■ The second question raised by the appeal is two-part in nature: (1) Did the Commission disallow nearly $806,000 of

license contract expenses claimed by Telephone Co. for its refusal to produce certain documents for inspection by the Public Advocate's expert witness or for Telephone Co.'s failure to meet its burden of proof of such expenses; and (2) Should the Commission's basis for disallowance be sustained? Counsel for the Commission appeals Superior Court's reversal of the Commission's disallowance of the claimed business expenses. The Court found the Commission's disallowance ruling to be solely intended as a sanction for Telephone Co.'s perceived violation of the Commission's protective order controlling discovery. The Court then ruled that the sanction had been prematurely and arbitrarily imposed without fair notice and an opportunity to Telephone Co. to be heard. Counsel for the Commission contests both rulings as contrary to the record and the proper scope of review.

We find the Commission's opinion ambiguous as to its grounds for disallowance of nearly $806,000 of Telephone Co.'s license contract expenses.[16] We quote in full the Commission's disallowance ruling:

14. Indeed, the Commission's Order is inherently inconsistent with the Commission's own approval of Telephone Co.'s first requested accounting change, noted at the outset, to expense its post-1980 inside wiring expenses on the four-year phase-in basis allowed by the FCC. To permit a phase-in of the expensing of post-1980 costs indicates recognition of the prior capitalization of such costs.

15. Any doubt as to the FCC's intention underlying its 1981 Expensing Order was removed by its January "1983 Pre-emption Order" in which it stated in part:
"Thus, the Expensing Order is binding upon state commissions and they must expense additions to inside wiring in accordance with the plan established therein. Moreover, they must follow the amortization procedures adopted in that decision for the embedded inside wiring and any additions to the capitalized amount as a result of the phase-in of the expensing of inside wiring." FCC Memorandum Opinion and Order of January 6, 1983 (the "1983 Pre-emption Order") at 17, ¶ 44.
While we need not determine whether the FCC's rulings in this regard pre-empt the Commission from following contrary practices, it is clear that the Commission erred in using the

FCC 1981 Expensing Order as a basis for removing Telephone Co.'s embedded inside wiring from its rate base.

16. Superior Court explains the term "license contract expenses" and the background of the controversy over the production of documents relating to such expenses as follows:
"License contract expenses are amounts paid under contract between [Telephone Co.] and its affiliate, American Telephone and Telegraph, which allow [Telephone Co.] to use AT & T patents and provide for centralized services by AT & T, such as pension fund management. The documents in question are 'budget decision packages,' which are owned by AT & T, and 'case authorizations,' which are owned by Bell Telephone Laboratories, which is also an affiliate of AT & T. In their response to the Public Advocate's request for production, AT & T claimed that 10% of the budget decision packages and Bell Laboratories claimed that all of the case authorizations fall within the scope of a protective order entered by the Commission. Contending that the Public Advocate's expert is employed by their competitors, they offered to produce the documents under a protective agreement. Bell Laboratories took the further position that it would produce only a 25%

The OPA [Office of Public Advocate] proposed a $805,998 disallowance of the License Contract expenses *supposedly authorized and justified by* documents (Bell Labs Case Authorizations and AT & T General Department Budget Decision Packages) which Applicant [Telephone Co.] refused to supply upon request to the Public Advocate's expert witness, Dr. John W. Wilson. The Applicant asserted that it had the right, under the Protective Order adopted in this proceeding, to impose special limitations upon Dr. Wilson's review of these documents since Dr. Wilson 'worked for competitors.'

The Commission finds that its Protective Order granted no right to Applicant to unilaterally limit the Public Advocate's expert witness to a review of only one of four of the Case Authorizations, the condition imposed by Applicant's sister company Bell Labs and asserted jointly by Applicant in its own behalf and on behalf of Bell Labs.

The Public Advocate is a public officer with the power by statute to inspect all relevant documents under appropriate restrictions as to public disclosure. Applicant's refusal to furnish these documents, which we find to be relevant and material to this issue, necessitates disallowance of a portion of the expenses claimed by the Applicant in this case. The Commission therefore hereby grants the request of the Office of the Public Advocate and rejects the sum of $805,998 in claimed License Contract expenses of Applicant. It must be recognized that we are dealing here with transactions between a wholly-

owned subsidiary and its parent, *the sort of matter as to which the law requires special scrutiny,* which examination has been frustrated by the position of the parent company. (emphasis added).

It is clear that a public utility has the burden of proof of any claimed expenses, 26 *Del.C.* § 307; [17] and counsel for the Commission argues that the Commission's disallowance is attributable, at least in part, to Telephone Co.'s failure to meet that burden by its refusal to produce the documents justifying such expenses for inspection by the consultant for the Public Advocate. We think the question is a close one and the emphasized portions of the Commission's ruling tend to support rate counsel's position.

While the Commission did not make a "clear finding" that Telephone Co. had failed to meet its burden of proof of such expenses, as Superior Court correctly noted, the issue is not free from doubt. The documents which Telephone Co. declined to provide the Public Advocate's expert witness were found by the Commission to be "relevant and material" to the license contract expenses that were disallowed; and the Commission referred to the contract expenses in question as "claimed" and as requiring "special scrutiny." Further, the Hearing Examiner, whose report was incorporated in the Commission's decision, concluded that it was "impossible to justify" Telephone Co.'s expenses "without careful inspection" of the pertinent documents; and he recommended disallowance of such expenses.[18]

sample for the Public Advocate's expert, while making all of the documents available to the Public Advocate himself, so that he could satisfy himself of the representative nature of the sample examined by his expert. All of the documents were available to the Commission's staff and its experts."

**17.** 26 *Del.C.* § 307 provides, in pertinent part:
   § 307. *Burden of proof; speedy determination.*
   (a) In any proceeding upon the motion of the Commission, or upon complaint, or upon application of a public utility, involving any pro-

posed or existing rate of any public utility, or any proposed change in rates, the burden of proof to show that the rate involved is just and reasonable is upon the public utility.
   (b) The public utility shall have the burden of proof in justifying every accounting entry of record questioned by the Commission which may suspend any charge or credit pending submission of satisfactory and sufficient proof in support thereof by the public utility.

**18.** In view of the Hearing Examiner's clear recommendation of disallowance of the license contract expenses for withholding documentation thereof, it is not unreasonable to read the

In our view, the Commission's rationale for its disallowance ruling is not clear; and the Commission's failure to make a "clear finding" on the burden of proof issue does not remove this doubt. Indeed, the Court recognized the Commission's right to disallow an expense for lack of documentation to support the expense; and the Commission's ruling may arguably be so construed.

We conclude that remand is necessary for the Board to make explicit whether disallowance is based on failure of proof or imposed as discovery sanctions. Until the Commission clarifies the basis and rationale for its expense disallowance ruling, this Court cannot exercise its review function.

## II

■ We turn to the subject of Telephone Co.'s cross-appeal: Did Superior Court err in not requiring its August, 1982 rulings favorable to Telephone Co. to be given retroactive effect to the date of the Commission's overruled rate Order of October 8, 1981?

To understand the question and its significance requires recounting some of the procedural history of the case. The Commission's general rate Order dated October 8, 1981 (and made effective that date) found certain rates applied for by Telephone Co. to be "unjust and unreasonable" and required Telephone Co. to file a new tariff in compliance with the Commission's findings and decision within 30 days. Telephone Co. presumably filed such a tariff and then appealed the Commission's ruling to Superior Court on December 2, 1981.

However, Telephone Co. did not seek to stay the Commission's rate adjustment Order or obtain any other relief from its impact pending appeal until after September 17, 1982. On that date, the appeal was finally resolved in Telephone Co.'s favor on the two litigated issues—exclusion of inside wiring from rate base and disallowance of certain license contract expenses. From October 8, 1981 to September 17, 1982, Telephone Co. had chosen not to seek interim relief under § 511 [19] of the Public Utilities Act or comparable relief under the judicial review provisions of the Delaware Administrative Procedures Act, 29 *Del.C.* § 10144.[20]

Instead, Telephone Co. permitted—over the intervening period of the appeal—the Commission's new tariff rates to go into effect, notwithstanding appeal and without legal protest until the appeal had been finally and successfully concluded before Superior Court. Telephone Co. then petitioned Superior Court to make its favorable rulings effective retroactively to October 8, 1981, the date of the Commission's "erroneous" rate Order. The Commission opposed the application; and following hearing, the Court declined to grant Telephone Co. the requested relief by Order entered November 1, 1982.

Telephone Co. then applied to Superior Court for relief under 26 *Del.C.* § 511, asking that the Commission's Order be stayed pending further appeal; and Superior Court immediately granted the requested stay under 26 *Del.C.* § 511, subject to Telephone Co.'s filing of a new rate tariff and posting of a bond with surety approved by the Court, as required by § 511. The

Commission's ruling as not only adopting the Hearing Examiner's recommendation but his reasoning as well. The fact that the documents were available to the Commission and its staff does not answer the Commission's concern that the documents were entitled to "special scrutiny" by the Public Advocate's expert.

19. 26 *Del.C.* § 511 provides:

§ 511. Stay pending appeal.

The filing of an appeal from any order of the Commission shall in no case supersede or stay the order of the Commission, unless the Superior Court so directs, and the appellant may be

required by the Court to give bond in such form and of such amount as the Court, allowing the stay, requires.

20. 29 *Del.C.* § 10144 provides:

§ 10144. Stay pending review.

When an action is brought in the Court for review of an agency regulation or decision, enforcement of such regulation or decision by the agency may be stayed by the Court only if it finds, upon a preliminary hearing, that the issues and facts presented for review are substantial and the stay is required to prevent irreparable harm.

Court's Order (which was also entered pursuant to 29 *Del.C.* § 10144) invoked a stay of so much of the Commission's 1981 Order as "establishe[d] rates based on determinations as to the investment of [Telephone Co.] in station connections and the expenditures of [Telephone Co.] with respect to license contracts, which ... [were] inconsistent with [the Court's August 12, 1982 Opinion]." The Order affirmatively permitted Telephone Co. to put into effect its revised tariff based on the inclusion of its inside wiring in its rate base and the allowance of its license contract expenses—subject to the posting of a surety bond in an amount sufficient to cover any revenues collected by Telephone Co. during the pendency of the stay that exceeded revenues otherwise allowable in the absence of stay.

The cross-appeal is directed to Superior Court's November 1 ruling denying Telephone Co.'s application that the Court *direct* the Commission to fix rates that would permit the utility to recoup all revenues lost as a result of the Commission's erroneous rate Order of October 8, 1981, *i.e.*, its revenue losses between October 8, 1981 and November 2, 1982, the effective date of the Court's stay Order entered under 26 *Del.C.* § 511 and 29 *Del.C.* § 10144.

The ultimate question is whether Superior Court committed legal error in concluding that the requested relief would impermissibly involve the Court in retrospective rate-making without a clear legislative mandate, particularly in view of the relief available to Telephone Co. under 26 *Del.C.* § 511 and 29 *Del.C.* § 10144. The Court stated:

> I conclude that the very strong judicial policy of avoiding any retrospective rate-making in the absence of clear legislative mandate should be followed. The General Assembly has dealt with the problem of regulatory delay—and the delay resulting from erroneous decision by the Commission and the time taken to dispose of appeals is part of the general problem of regulatory delay. The General Assembly has provided for this by allowing higher rates to be put into effect under bond, and that remedy is available on appeal as well. The General Assembly has not provided for any recouping, except in the situation where the Commission orders a reduction of rates which is later held to be improper.

> I think the prohibition of retrospective rate-making is based in large part on the expectations of people and the impact that this would have on utilities and on the users of utility services. Ultimately, the way of dealing with problems such as regulatory delay is a question of policy which should be resolved by the legislature and not the Court, and the basic rule that there should be no retrospective rate-making in the absence of clear legislative mandate applies here.

Telephone Co. asserts essentially two grounds for finding Superior Court to have committed legal error in refusing to direct the Commission to impose a retroactive surcharge. *First,* Telephone Co. argues that having prevailed upon the appeal, a retroactive surcharge comes within a recognized exception to the general rule prohibiting retrospective rate-making. *Second,* Telephone Co. argues that the Delaware "stay statutes" (26 *Del.C.* § 511 and 29 *Del.C.* § 10144) do not evidence legislative intent to preempt the Court from granting retroactive relief and that there is Delaware precedent for such relief. (On analysis, Telephone Co.'s two arguments are, in reality, one because they are interdependent, as will be seen.) Telephone Co.'s first argument is essentially an appeal to "fairness": that having prevailed upon appeal, it should be permitted to "recoup" the approximately $4,000,000 of lost revenues and $806,000 of license contract expenses lost or denied to it by reason of the Commission's erroneous rulings.[21] Without a retroactive surcharge,

---

**21.** However, this "loss" would have to be adjusted downward to take into account "somewhat higher rates" which the Commission had authorized effective April 1, 1982 under the Commission's *ad hoc* annual review procedure established in its 1981 rate order.

Telephone Co. argues that its revenue loss through Commission error is unrecoverable and its customers will have obtained, in effect, a "windfall" from the receipt of services at less than their legally authorized rates. We conclude that Superior Court properly declined to grant Telephone Co. the requested relief, as a matter of law.

For the Court to grant Telephone Co. the requested relief would clearly involve the judiciary (a) in the rate-making process; and (b) in retroactive rate-making—that is, the imposition on future rates of a surcharge to recover a utility's past losses from past services. The Delaware General Assembly has conferred on the Public Service Commission "exclusive original" jurisdiction over public utilities and their rates. 26 *Del.C.* § 201.[22] (*See also* 26 *Del.C.* § 304 [23] governing rate changes initiated by a public utility and 26 *Del.C.* § 309 [24] governing rate changes initiated by the Commission.) Superior Court's jurisdiction over an appeal from a final order of the Commission is conferred by 26 *Del.C.* § 510; [25] and under § 510 the Court may set aside a commis-

sion's erroneous rulings. However, § 510 does not confer any authority on the Court to impose a rate surcharge on existing rates as a means of remedying on appeal an erroneous Commission order. And clearly such an order, if entered, would constitute retrospective rate-making. We do not understand Telephone Co. to claim otherwise. Instead, Telephone Co. argues that such appellate relief has been granted, though in admittedly few instances, as an implied and necessary judicial power for appellate review to be meaningful to a prevailing party.[26]

A pervasive and fundamental rule underlying the utility rate-making process is that "rates are exclusively prospective in application and that future rates may not be designed to recoup past losses" in the absence of express legislative authority. *Transcontinental & Western Air, Inc. v. Civil Aeronautics Board,* 336 U.S. 601, 69 S.Ct. 756, 93 L.Ed. 911 (1949); *Bebchick v. Washington Metropolitan Area Transit Com'n,* D.C.Cir., 485 F.2d 858 (1973); *La. Power & Light v. La. Public Service Com'n,*

---

**22.** 26 *Del.C.* § 201 provides, in pertinent part:

The Commission shall have exclusive original supervision and regulation of all public utilities and also over their rates, property rights, equipment, facilities and franchises so far as may be necessary for the purpose of carrying out the provisions of this title. . . .

**23.** 26 *Del.C.* § 304 provides, in pertinent part:

Unless the Commission otherwise orders, no public utility shall make any change in any existing rate except after 60 days notice to the Commission. . . .

**24.** 26 *Del.C.* § 309(a) provides, in pertinent part:

The Commission may, after hearing, upon notice, by order in writing, fix just and reasonable individual rates. . . .

**25.** 26 *Del.C.* § 510(b) provides that judicial review shall be on the record before the Commission rather than a trial *de novo*; and § 510(c) provides with respect to scope of review:

The scope of review before the Court shall be that the Commission's findings shall be upheld if they are supported by sufficient evidence, free of error of law and not arbitrary or capricious. When factual issues are reviewed the Court shall take due account of

the presumption of official regularity and the quasi-legislative function and specialized competence of the Commission.

**26.** Telephone Co. primarily relies upon *Potomac Electric Power Co. v. Public Service Commission,* D.C.App., 380 A.2d 126 (1977), aff'd, D.C.App., 402 A.2d 14 (1979), *cert. denied* 444 U.S. 926, 100 S.Ct. 265, 62 L.Ed.2d 182 (1979) (Court sitting en banc vacated a panel decision in favor of the utility, directing remand to commission to devise a means to restore to utility revenues lost through the appeal process. By the en banc reversal, the question of utility being "made whole" for revenues lost during the appeal was mooted). *See also Appeal of Granite State Elec. Co.,* N.H.Supr., 120 N.H. 536, 421 A.2d 121 (1980); *In Re New England Telephone & Telegraph Co.,* Vt.Supr., 131 Vt. 310, 305 A.2d 598 (1973); *Petition of Allied Power and Light Co.,* Vt.Supr., 133 Vt. 586, 350 A.2d 360 (1975). Relying on this authority, Telephone Co. argues that a judicially imposed temporary surcharge on future rates is a permissible form of retrospective rate-making which has been invoked to provide a means of appellate redress to a utility for revenue losses sustained in the course of a successful appeal of an erroneous commission ruling or stay of a rate increase.

La.Supr., 377 So.2d 1023 (1979); *Rhode Island Consumers' Council v. Smith,* R.I.Supr., 111 R.I. 271, 302 A.2d 757 (1973).

The rationale of this principle is that the Commission acts in a legislative capacity in exercising its rate making authority; that rate making orders have statutory effect; and, that, as such, they are subject to the rules ordinarily applied in statutory construction. *Arizona Grocery Co. v. Atchinson T. & S.F. Ry.,* 284 U.S. 370, 52 S.Ct. 183, 76 L.Ed. 348 (1932).

The Supreme Court of the United States has also ruled that to accord a rate order retroactive effect, requires "the clearest mandate". *Claridge Apartments Co. v. Commissioner of Internal Revenue,* 323 U.S. 141, 65 S.Ct. 172, 89 L.Ed. 139 (1944).

*La. Power & Light v. La. Public Service Com'n, supra,* at 1028.

This principle has been applied to preclude, almost without exception, public service commissions and/or courts from engaging in retroactive rate-making. *Claridge Apartments Co. v. Commissioner of Internal Revenue,* 323 U.S. 141, 65 S.Ct. 172, 89 L.Ed. 139 (1944); *Los Angeles Gas & Electric Corp. v. Railroad Commission of California,* 289 U.S. 287, 53 S.Ct. 637, 77 L.Ed. 1180 (1933); *La. Power & Light v. La. Public Service Com'n, supra; New England Tel. & Tel. v. Public Util. Com'n,* Me.Supr., 362 A.2d 741 (1976); *Michigan Bell Tel. Co. v. Michigan Pub. Serv. Com'n,* Mich.Supr., 315 Mich. 533, 24 N.W.2d 200 (1946); *Mississippi Public Serv. Com'n v. Home Telephone Co.,* Miss.Supr., 236 Miss. 444, 110 So.2d 618 (1959); *Lambertville Water Co. v. N.J. Bd. of P.U.C.,* N.J.Supr., 79 N.J. 449, 401 A.2d 211 (1979); *New Jersey Power & Light Co. v. State Dept. of P.U.,* N.J.Supr., 15 N.J. 82, 104 A.2d 1 (1954) (overruling *Hackensack Water Company v. Board of Public Utility Commissioners,* N.J.Supr., 98 N.J.L. 41, 119 A. 84, aff'd 100 N.J.L. 177, 124 A. 925 (1924) [holding that a public utility may recoup deficits in operations by temporary surcharges added to its regular rates] ); *State ex rel. Utilities Com'n v. Edmisten,* N.C.Supr., 291 N.C. 451, 232 S.E.2d 184 (1977); *New England Telephone and Telegraph Co. v. Public Utilities Commission,* R.I.Supr., 116 R.I. 356, 358 A.2d 1 (1976); *Wisconsin Telephone Co. v. Public Serv. Com'n,* Wis.Supr., 232 Wis. 274, 287 N.W. 122 (1939).

Decisional law in other jurisdictions permitting a utility to recoup by rate surcharge its revenue losses incurred in appeal of an erroneous agency ruling is sparse.[27] Moreover, on analysis, there is no well-defined minority rule that is not both legislative intent oriented (thereby adhering to the majority rule) *and* equity oriented (in terms of providing a utility with meaningful appellate relief that is otherwise unavailable).[28] Thus, prevailing law is substan-

**27.** Vermont appears to be the only jurisdiction with any consistent decisional law approving rate surcharges to restore to a utility revenues lost through erroneous public service commission rulings. (See footnote 25). Under Vermont cases, authority to recoup is based on express statutory authority (30 V.S.A. § 226(b)) *and* fairness or "inherent equities" in requiring there be a remedy for a successful appeal from an erroneous commission rate order. *In re Village of Morrisville Water & Light Dept.,* Vt.Supr., 134 Vt. 428, 365 A.2d 525 (1976). (The Vermont authorities do not discuss the substantial body of case law espousing the majority rule condemning retrospective rate surcharges.)

**28.** In *Potomac Electric Power Co. v. Public Service Commission,* D.C.App., 380 A.2d 126 (1977), aff'd, D.C.App., 402 A.2d 14 (1979), cert. denied 444 U.S. 926, 100 S.Ct. 265, 62 L.Ed.2d 182 (1979), the panel decision that was vacated by the court en banc espoused the equitable argument of permitting recoupment to make "whole" a utility for revenues lost in the course of appealing an erroneous commission ruling. *See also In re Village of Morrisville Water & Light Department, supra,* at footnote 26. In *Lambertville Water Co. v. N.J. Bd. of P.U. Com'rs,* N.J.Super., 153 N.J.Super. 24, 378 A.2d 1158 (1977), rev'd on other grounds, N.J.Supr., 79 N.J. 449, 401 A.2d 211 (1979), a rate surcharge for revenues lost during appeal was initially granted but mooted by the reversal. However, the New Jersey Supreme Court declined to address the "issue of retroactivity", stating: "[t]he problems in trying to give retroactive effect to a rate increase are formidable", citing *New Jersey Power & Light Co. v. State Board of Public Utilities,* N.J.Supr., 15 N.J. 82, 104 A.2d 1 (1954), which follows the majority rule proscribing retroactive rate-making.

tially uniform in rejecting retrospective rate surcharges even in the case of meritorious appeals in the absence of both a clear legislative mandate and a showing that appellate redress cannot otherwise be obtained. For the reasons that follow, neither showing has been made in this case, *i.e.*, legislative authority to grant retrospective rate surcharges of this nature and the absence of a means for obtaining relief from an erroneous commission rate order.

The question presented is one of first impression.[29] We do not find in the Delaware Public Utilities Act, 26 *Del.C.* §§ 101 through 511, or in Delaware statute law generally, any legislative grant of authority to the Delaware Public Service Commission or to the courts, on review of a commission order, to impose a retroactive rate surcharge of the nature requested by Telephone Co. The Commission being a creature of the Legislature, its powers are limited to those conferred by the Legislature. *Kreshtool v. Delmarva Power and Light Co.,* Del.Super., 310 A.2d 649 (1973). The Commission's power to permit recoupment by temporary rate surcharge is, as Superior Court correctly noted, limited to "the situation where the Commission orders a reduction of rates which is later held to be improper." 26 *Del.C.* § 310.[30] This statute clearly has no application to the recoupment here sought. But by providing this limited form of recoupment, the Legislature must be deemed to have excluded any other form of recoupment. *Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 100

S.Ct. 242, 62 L.Ed.2d 146 (1979); 2A Sutherland, *Statutory Construction,* § 47.23 (rev. 3d ed. 1973). *A fortiori* there is lacking a clear legislative mandate to the Commission to accord a rate order retroactive effect so as to permit Telephone Co. to recoup its revenue losses incurred in the appeal.

On similar reasoning, we find no statutory authority, and hence no legislative intent, that retrospective rate-making may be judicially mandated—even upon a judicial determination of Commission error in rejecting a rate application. As previously stated, 26 *Del.C.* § 510 governing judicial review of a commission's order confers no such explicit authority on Superior Court. (*See* footnote 24). However, 26 *Del.C.* § 511 (*see* footnote 18) does confer on Superior Court the power to stay a commission order upon the giving of bond as fixed by the court. The provision of this form of remedial relief from an erroneous commission order thereby serves two purposes: (1) it provides a meaningful form of relief in the event of a successful appeal; and (2) it suggests, at the very least, that the Legislature did not intend to permit recoupment through rate surcharge as an alternative means of appellate redress for an erroneous commission ruling. Superior Court so held and we agree. Finding no error of law, we affirm.

\* \* \*

Affirmed in part and reversed in part as to the appeal, with jurisdiction reserved.

Affirmed as to the cross appeal.

---

**29.** We find the decisions in *Matter of Wilmington Suburban Water Corp.,* Del.Super., 367 A.2d 1338 (1976) and *Application of Diamond State Telephone Co.,* Del. PSC, 28 P.U.R.3d 121 (1959), relied on by Telephone Co. as authority to recoup past losses attributable to a prior accounting period, to be inapposite.

**30.** 26 *Del.C.* § 310 in pertinent part provides:
Whenever the Commission ... is of the opinion that any rates of any public utility are producing a return in excess of a reasonable rate of return upon its rate base ... the Commission may ... immediately enter a temporary order fixing a temporary schedule of rates to be charged by such public utility pending

final determination of such rate proceeding.... The temporary rate so prescribed shall be effective until the final determination of the rate proceeding.... If ... the rates as finally determined are in excess of the rates prescribed in such temporary order, then such public utility may amortize and recover by means of a temporary increase over and above the rates finally determined such sum as represents the difference between the operating revenues obtained from the rates prescribed in such temporary order and the operating revenues which would have been obtained under the rates finally determined if applied during the period such temporary order was in effect.