15 N.J. 82 (1954)
104 A.2d 1
IN THE MATTER OF THE REVISION IN RATES FILED BY NEW JERSEY POWER & LIGHT COMPANY INCREASING ITS RATES FOR ELECTRIC SERVICE TO RECOUP DEFICITS FOR THE YEARS 1951, 1952 AND FIVE MONTHS ENDING JUNE 1, 1953.
NEW JERSEY POWER & LIGHT COMPANY, PETITIONER-APPELLANT,
v.
STATE OF NEW JERSEY DEPARTMENT OF PUBLIC UTILITIES, BOARD OF PUBLIC UTILITY COMMISSIONERS, RESPONDENT.
The Supreme Court of New Jersey.
Argued March 1, 1954.
Decided March 29, 1954.
*83 Mr. Joseph F. Autenrieth argued the cause for the appellant (Messrs. Autenrieth & Rochester, attorneys).
Mr. Joseph Harrison argued the cause for the respondent (Mr. Wesley L. Lance, co-rate counsel; Mr. Joseph M. Jacobs, on the brief; Mr. Theodore D. Parsons, Attorney-General).
Mr. Ryman Herr appeared for the intervenors, Riegel Paper Corporation and Sanco Piece Dye Works, Inc. (Messrs. Herr & Fisher, attorneys).
The opinion of the court was delivered by VANDERBILT, C.J.
This appeal by the New Jersey Power & Light Company from a decision of the Board of Public Utility Commissioners dismissing its application for a surcharge of 5% on its newly established rates comes before us on the company's petition for certification granted by us, 14 N.J. 15 (1953).

I. THE FACTS
In October 1952 the company applied to the Board for a revision of its rates so that it could obtain additional revenue of $1,400,000 annually. In a decision handed down in May, 1953 the Board granted rate increases that would allow the company additional revenue of $991,141 a year, based on a return of 5.85%. No appeal was taken from this decision.
*84 On June 3, 1953, two days after the new schedule of rates went into operation, the company filed with the Board a notice that effective July 15, 1953 it would increase its rates by the addition of a surcharge of 5% to the new rates, effective for two years to permit the company to recoup a deficiency of $1,238,000 in gross revenue that had resulted under the order of the Board denying the application of the company for increased rates. The purpose of this surcharge was to restore to the company an alleged deficiency in net income of $578,000 in 1951, 1952 and the first five months of 1953 under the Board's order in the application of 1950 and thus to permit the company to obtain the minimum return contemplated by the earlier order of the Board.
In the proceedings commenced in 1950 the Board found the company's rate of return for the year 1950 after adjustments in revenues and expenses to be 6.52% on a net original cost rate base (91 P.U.R. (N.S.) 331, 340). This return the Board found not unreasonable, stating: "Actual operating results thus far available for 1951 do not support the company's claim that 1951 earnings will be lower than experienced in 1950. If anything there are significant indications that the reverse may be true." (91 P.U.R. (N.S.) 331, 341). The actual return determined on the basis of the same adjustments to earnings as those made by the Board in the 1950 case and on a rate base determined in the same manner as that found by the Board in that case, earned by the company in 1951 was 5.19%, in 1952 was 4.65% and, for the five months ending May 31, 1953 was 1.99%, which is equivalent to 4.78% on an annual basis.
The company's calculations of the deficiencies in returns which the company suffered as a direct result of the Board's action in the 1950 rate case were submitted on different bases:
First, the deficiencies suffered during 1951, 1952 and the first five months of 1953 were calculated by taking the amount by which the gross revenue was less than the anticipated gross revenue applying the lower range of reasonable return found by the Board in the 1950 proceedings, i.e., 5.53% on the net original cost rate base. On this basis, the deficiencies *85 in returns aggregated $589,000. Because of income taxes and gross receipt taxes, it would require $1,261,700 in gross revenues to recoup these deficiencies;
Second, the deficiencies suffered by the company were calculated by limiting them to 1952 and the first five months of 1953 and utilizing the amount below the allowable rate of return of 5.85% on the net original cost rate base found by the Board on May 13, 1953 in the company's 1952 rate proceeding as a result of which, as hereinbefore stated, the company was permitted to put increased rates into effect on June 1, 1953. In the 1952 proceedings the Board expressly admitted the existence of a deficiency in returns in 1952 of $463,150 below the allowed 5.85% rate of return and conceded the existence of a deficiency in returns for the first five months of 1953 of $185,000 when calculated on the same basis. Thus the total deficiencies for 1952 and the first five months of 1953 aggregated $647,000 and the gross revenues required to make good such deficiencies amounted to $1,384,600;
Third, calculations of deficiencies in returns based upon the upper range of reasonableness of rate return found by the Board in the 1950 proceeding, i.e., 6.52%, were also submitted. The deficits under this calculation were still greater both as to deficits in returns and required gross revenue to recoup the deficiency in such returns.
The amount of deficiencies in returns which the company sought to recover in this proceeding was slightly below the lowest of the three amounts so calculated, i.e., $587,000, and it is this amount which is the subject of appeal.
The decision of the Board in the 1950 rate case stated that rates of return from 5.53% to 6.52% lie within the range of reasonableness (91 P.U.R. (N.S.) 331, 365). The company's proofs in this proceeding established deficiencies in returns for the years 1951, 1952 and five months ending May 31, 1953, below the lower range of rate of return above stated. The company's proposed recoupment of deficiencies in returns through a 5% surcharge was estimated to be realized over a period of about two years in which event *86 the surcharge of 5% would be terminated. The Board in the 1952 rate case found that the company was entitled to a rate of return of 5.85% on a net original cost rate based on operations for the year 1952; that this rate of return had not been earned by the company in the year 1952 and that it had suffered a deficiency in return of $463,150 for that year, the equivalent of $991,141 deficiency in gross revenue.
At the conclusion of the company's case the State and two large consumers, the Riegel Paper Corporation and the Sanco Piece Dye Works, Inc., which had been permitted to intervene, moved for the dismissal of the petition for the surcharge "upon the ground that the proposed surcharge is based upon erroneous premises of fact and law, and upon unwarranted assumptions made in the statements, testimony and exhibits presented by New Jersey Power & Light Company." They argued that the company erred in its contention that in the 1950 proceeding the Board had actually set a minimum return of 5.53% and also that the Board lacked the power to permit such a surcharge. The Board granted the motion and from this decision the company appeals.

II. THE DOCTRINE OF THE HACKENSACK WATER COMPANY CASE
The company rests its case primarily on Hackensack Water Company v. Board of Public Utility Commissioners, 98 N.J.L. 41 (Sup. Ct. Dec. 7, 1922), 100 N.J.L. 177 (E. & A. April 17, 1924). The case, which was decided by a single justice in the former Supreme Court and affirmed in the Court of Errors and Appeals on the opinion below, held that a public utility is entitled to recoup deficits in operations by temporary surcharges added to its regular rates. In that case the Board had relied on Galveston Electric Co. v. City of Galveston, 258 U.S. 388, 42 S.Ct. 351, 66 L.Ed. 678 (1922), in denying such surcharges to the company, but the court, though likewise relying on that case, gave it an interpretation diametrically opposed to that of the Board. The Galveston case, decided seven months before the Hackensack *87 case, was the first expression of the United States Supreme Court on the question of whether or not it was confiscatory under the Fourteenth Amendment not to allow a public utility to recoup deficits in operations by surcharges. That court answered the question squarely in the negative in an opinion by Mr. Justice Brandeis, holding that public utilities were not entitled to a guaranty on their investment:
"If net deficits so estimated were made a factor in the rate base, recognition of 8 per cent as a fair return on the continuing investment would imply substantially a guarantee by the community that the investor will net on his investment ultimately a return of 8 per cent yearly, with interest compounded on deferred payments; provided only that the traffic will in course of time bear a rate high enough to produce that amount." 258 U.S. 388, at 394, 42 S.Ct. 351, at 354, 66 L.Ed. 678, at 682.
This was the view of the case adopted by the Board but our former Supreme Court, reasoning from certain language used by Mr. Justice Brandeis in his opinion, sought to confine its operation to those instances where the deficits were produced by the acts or failures of the public utility and not to apply it to cases where the deficits were caused by the rulings of state regulatory bodies:
"The Board [of Public Utility Commissioners] relies upon the recent decision of the United States Supreme Court in Galveston Electric Co. v. [City of] Galveston [258 U.S. 388, 42 S.Ct. 351, 66 L.Ed. 678], but this view of the effect of that decision seems erroneous. Mr. Justice Brandeis says: `A company which has failed to secure from year to year sufficient earnings to keep the investment unimpaired and to pay a fair return whether its failure was the result of imprudence in engaging in the enterprise, or of errors in management, or of omission to exact proper prices for its output, cannot erect out of past deficits a legal basis for holding confiscatory for the future rates which would, on the basis of present reproduction value, otherwise be compensatory.'
"It might well be held that the court, in naming these three species of deficits (imprudence in engaging in the enterprise, errors in management, and omission to exact proper prices) meant to make an enumeration of the cases to which the opinion applies, none of which is the present case, but it is unnecessary to go as far as that, and it may be conceded that the list is not a complete enumeration and that other causes may occur which may stand on the same legal footing. Be that as it may, the reasoning of the opinion applies *88 only to deficits due to the conduct of the public utility itself and does not justify the refusal to include deficits that are due to the acts of the public authorities alone." 98 N.J.L. 41, supra, at 43, 44.
Georgia Railway & Power Co. v. Railroad Commission, 278 F. 242 (D.C. Ga. 1922), decided a few months before the Hackensack case, had been cited to the court in the argument of the Hackensack case but the court rejected its holding which was as follows:
"The claim that the failure to earn a reasonable return, if established, should now be either allowed as capital investment or amortized under this or future rates we cannot allow. To concede this as a right would be to guarantee income, and would raise a correlative duty to account for earnings beyond what were reasonable in the past. No limit could be placed to the period of the inquiry, nor could justice really be done by it to the individual stockholders or consumers actually concerned, for these are constantly changing. A rate established as reasonable, whether by the company or by the commission, is not guaranteed by the commission or the public. Whether it will actually yield more or less than a fair return during its continuance is a risk of the business. We do not deny that it is within the discretion of the commission to consider the experience of the immediate past in fixing a just rate for the future, but we hold that no legal right exists to have disappointments or surprises in results balanced." (Italics supplied.) (278 F. at 247)
The decision of the District Court, supra, was affirmed on appeal to the United States Supreme Court, 262 U.S. 625, 43 S.Ct. 680, 67 L.Ed. 1144, the court in an opinion again by Mr. Justice Brandeis holding:
"That past losses are not to be capitalized as property on which the fair return is based was held in [City of] Knoxville v. Knoxville Water Co., 212 U.S. 1, 14, 29 S.Ct. 148, 53 L.Ed. 371; Galveston Electric Co. v. [City of] Galveston, supra. Here this conclusion seems even clearer than it was in those cases. The losses under consideration in the case at bar were obviously not a part of development cost. They were due to insufficiency of previous rates." (262 U.S. 625, at 632, 43 S.Ct. 680, at 682, 67 L.Ed. 1144, at 1148)
The sole dissent from this opinion was by Mr. Justice McKenna, who took exception to the italicized words quoted from the District Court's opinion, supra, apparently on the ground that it ran counter to the Federal Constitution. His *89 dissent gives added weight to the scope of the decision of the court. This pronouncement came after the decision of our former Supreme Court in the Hackensack case but before the decision in the Court of Errors and Appeals, where the Georgia Railway case in the United States Supreme Court was cited to the court but was not followed by it.
In Bluefield Water Works & Improvement Co. v. Public Service Commission, 262 U.S. 679, 43 S.Ct. 675, 67 L.Ed. 1176 (1923), decided on the same day as the Georgia Railway case, supra, the United States Supreme Court, speaking through Mr. Justice Butler, recognized that:
"The company may not insist as a matter of constitutional right that past losses be made up by rates to be applied in the present and future * * *." (262 U.S. 679, at 694, 43 S.Ct. 675, at 679, 67 L.Ed. 1176, at 1183)
To the same effect is the same justice's observation in Board of Public Utility Commissioners v. New York Telephone Co., 271 U.S. 23, at 31, 46 S.Ct. 363, at 366, 70 L.Ed. 808, at 812 (1926):
"If there is no return, or if the amount is less than a reasonable return, the company must bear the loss. Past losses cannot be used to enhance the value of the property or to support a claim that rates for the future are confiscatory."
The rule became so well established as to be stated summarily in Wisconsin Telephone Co. v. Public Service Commission, 232 Wis. 274, 287 N.W. 122, 593 (Sup. Ct. 1939) (certiorari denied 309 U.S. 657, 60 S.Ct. 514, 84 L.Ed. 1006 (1940)):
"As already pointed out, the cases hold that in establishing a rate for the future and in the absence of statutory authorization therefor, the Commission may not amortize a loss or make a rate sufficiently low to recapture the excesses." (287 N.W. 122, at 137)
That the federal rule works both ways was demonstrated in Los Angeles Gas & Electric Corp. v. Railroad Commission of *90 California, 289 U.S. 287, at 313, 53 S.Ct. 637, at 647, 77 L.Ed. 1180, at 1197 (1933), where Mr. Chief Justice Hughes, in speaking for the court, said:
"Deficits in the past do not afford a legal basis for invalidating rates, otherwise compensatory, any more than past profits can be used to sustain confiscatory rates for the future."
Thus it is clear that while there was some justification in state decisions for the holding in the Hackensack case when it was first handed down in our former Supreme Court, the trend of the decisions has been in the opposite direction not only in the Federal courts but also in the state courts and before state commissions: Western Oklahoma Gas & Fuel Co. v. State, 113 Okl. 126, 239 P. 588, 591 (Sup. Ct. 1925); Re Great Northern Utilities Co., 26 P.U.R. (N.S.) 393, 397 (Montana, 1933), Re New York Telephone Co., 84 P.U.R. (N.S.) 267, 295 (N.Y. 1950); Re Carolina Mountain Telephone Company, 89 P.U.R. (N.S.) 13, 19 (N.C. 1951), Re Southwestern Bell Telephone Co., 92 P.U.R. (N.S.) 481, 502 (Mo. 1952). The rationale of these decisions is well summarized in Hope Natural Gas Co. v. Federal Power Commission, 196 F.2d 803, 808 (4 Cir. 1952) where Chief Judge Parker said:
"With changes in economic conditions rates must be changed from time to time, and the lag which necessarily accompanies the making of changes may result to the benefit of the utility as well as to its detriment. * * *
It is true, of course, that a utility is entitled to rates that are just and reasonable; but this is not to say that rates must fluctuate automatically with every change in economic conditions or that a reasonable time may not be allowed for determining the reasonableness of a proposed increase in rates before it is allowed to go into effect. Any loss sustained by a maintenance of the status quo while such determination is being made is properly considered, not as a violation of constitutional right, but as a necessary incident of rate regulation so long as the period of suspension does not `overpass the bounds of reason.' See American Telephone & Telegraph Co. v. United States, 299 U.S. 232, 247, 57 S.Ct. 170, 177, 81 L.Ed. 142; Federal Power Commission v. East Ohio Gas Co., 338 U.S. 464, 475, 70 S.Ct. 266, 94 L.Ed. 268."
*91 Not only has the decision in the Hackensack case been rendered ineffectual by the course of federal decisions, but the decision has been ignored by the Board for over a quarter of a century in complying with its statutory duty to "fix just and reasonable * * * rates," R.S. 48:2-21. It will serve no good purpose to review those decisions of the Board seriatim; suffice it to say that in the instances where the orders of the Board were taken to court the question of the right to surcharge was not raised and the Hackensack case was never cited, Plainfield Union Water Co. v. Board of Public Utility Com'rs, 6 N.J. Misc. 267 (Sup. Ct. 1928); Middlesex Water Co. v. Board of Public Utility Com'rs, 6 N.J. Misc. 107 (Sup. Ct. 1928); Plainfield Union Water Co. v. Board of Public Utility Com'rs, 117 N.J.L. 18 (Sup. Ct. 1936); New Jersey Suburban Water Co. v. Board of Public Utility Com'rs, 122 N.J.L. 54 (Sup. Ct. 1939), affirmed 123 N.J.L. 303, 306 (E. & A. 1939). On the contrary, in Acquackanonk Water Co. v. Board of Public Utility Com'rs, 1 N.J. Misc. 575, 579 (Sup. Ct. 1923), affirmed without opinion, 100 N.J.L. 169 (E. & A. 1924), though the Hackensack case was not mentioned, the decision was opposed to the doctrine of that case:
"The next point is that the board was in error in not taking into account the deficiency in earnings caused by the action of the board in preventing the companies from obtaining adequate rates during the litigation through its order suspending the posted rates. But the companies were collecting all the rates they were entitled by law to collect, and the board would not have been justified in undertaking to make up any such deficiencies."
Looking backward in the light of subsequent decisions, it is not difficult to perceive the inherent contradictions in the Hackensack decision. Thus the opinion concedes:
"It is, to be sure, not for the Public Utility Board to guarantee a rate to the public utility company, and I agree that it would be improper to allow the public utility company to capitalize its losses * * *. To allow all deficits to be capitalized and added to the base value would be unjust to future consumers, who would be burdened perpetually * * *. To make up the loss of the company *92 by increase in the rate for a single year would impose an undue burden on present consumers." 98 N.J.L. 41, supra, at p. 44
These views, while consistent with the prevailing rule in the federal cases hereinbefore cited, are obviously at variance with the conclusions of the decision itself. Thus:
"There is nothing unfair in holding the public to a guarantee that the rate fixed shall come within the authority fixed by the statute and be just and reasonable. * * *" (98 N.J.L., at 44)
ignoring the fact that the Board cannot make a guaranty of return to a public utility. Again the Board's duty under the statute is to fix "just and reasonable * * * rates," R.S. 48:2-21, but the opinion holds:
"The usual method of correcting the error after the loss is ascertained, is by amortization, by allowing an additional charge; that is, a higher rate, for such a length of time as will suffice to wipe out the deficit." (98 N.J.L., at 44)
To do this would be adding a further charge to rates that are already just and reasonable, which is beyond the Board's powers. Finally the opinion states:
"The consumer will then pay the cost of the experiment, but it will be so distributed that it may be paid during what may be called the life of the experiment." (98 N.J.L. at 45)
Obviously this is not so, because the surcharge is not imposed until "the experiment is at an end" and the imposition of a surcharge is therefore inconsistent with its being paid for "during the life of the experiment." Nor is it at all clear if a public utility may not capitalize its losses, or impose them on its present customers for a single year, as the opinion concedes it cannot, why it should be permitted to allocate such surcharges, admittedly imposed above just and reasonable rates, on its present and future customers for a period of years.
The fundamental defect of the Hackensack opinion in its practical operation is that it requires the Board to look *93 both forward and backward in rate-making when the orderly processes of rate-making are necessarily present and prospective if rate-making is to be effective. The decision would authorize just and reasonable rates for the present and future and then add thereto surcharges for the past errors of "a rate-making experiment." This point of view is inconsistent with the businesslike processes of rate-making that have received the approval of this court:
"Where by reason of circumstances beyond the control of the Utility and unforeseeable at the time of the rate order it becomes apparent that the existing rates are insufficient to provide a fair rate of return, and rates reasonable both to the public utility and the public, the remedy is not by way of invalidation of the past order on the basis of the subsequent events introduced in evidence before the appellate court, but by way of filing new schedules of rates in accordance with the statutory requirements. * * *" In re New Jersey Power & Light Co., 9 N.J. 498, 527 (1952)
See also New Jersey Bell Tel. Co. v. Department of Public Utilities, Board of Public Utility Com'rs, 12 N.J. 568, 582-583 (1953). The present practice, as set forth in these cases, is fair to the public utility, for it can act as speedily as it sees fit to move for a correction of inadequate rates, and it is fair to the consumer in safeguarding him from surprise surcharges dating back over years that he had a right to assume were finished business for him and possibly over years when he was not even a consumer.
Not only does the company have its power to file new rate schedules, as above set forth, but it may apply for ad interim relief through negotiation and agreement:
"The board may, during the pendency of any hearing instituted by it, on its own initiative or on complaint, in which the approval or fixing of just and reasonable individual rates, joint rates, tolls, charges or schedules thereof, as well as commutation, mileage or other special rates is in issue, or at any other time, negotiate and agree with any public utility for an adjustment of the individual rates, joint rates, tolls, charges or schedules thereof, as well as commutation, mileage or other special rates for any product or service supplied or rendered by such public utility. Such adjustment may be for, or without, a specified limit of time. In no event shall any such adjustment be regarded as contractual. Such adjustment shall *94 at all times be subject to change through the proceedings provided for by this chapter, or through negotiation and agreement under this section. The board as a part of any such negotiation and adjustment shall provide for the continuance, suspension or other disposition of any hearing of the character aforesaid then pending." R.S. 48:2-21.1 (Italics supplied.)
The company made no application under this statute. On the contrary, even after the affirmance by this court of its appeal from the 1950 application for rate increases (May 26, 1952), it waited five months before it filed its next application for a rate increase on October 16, 1952 and it made no application for surcharges until two days after this application became effective on June 1, 1953.
The course of opinions in the United States Supreme Court since the handing down of the Hackensack decision, the fact that the decision has long been ignored both in proceedings before the Board and in the courts, and that decisions have been handed down here in conflict with it, the inherent contradictions of the decisions that have become apparent in the course of time, its unworkableness in practice and its direct conflict with the sound principles of rate-making approved in recent decisions of this court, all indicate the necessity of our overruling Hackensack Water Company v. Board of Public Utility Commissioners, 98 N.J.L. 41 and 100 N.J.L. 177, supra, and we accordingly so do.

III. THE APPLICABLE STATUTES
The company relies not only on the Hackensack case, but also on L. 1935, c. 48 (R.S. 48:2-29.3 and 48:2-29.4) which reads as follows:
"Whenever any public utility shall heretofore have been or shall hereafter be authorized by the board to collect a surcharge to raise a definite amount of money or for a specified purpose and the board, after hearing upon notice, shall determine that the amount authorized has been collected, or that the specified purpose has been accomplished, the board is hereby empowered to require by an order in writing the immediate discontinuance of such surcharge." (R.S. 48:2-29.3)
*95 "Whenever after hearing upon notice the board shall determine that any public utility has collected by means of a surcharge an amount of money exceeding the authorized amount or has continued to collect a surcharge after the specified purpose for which it was authorized has been accomplished, the board may require such public utility by an order in writing to repay the excess so collected to those from whom the same was collected." (R.S. 48:2-29.4)
The company claims that the statute relates to surcharges authorized by the Hackensack case in rate proceedings and that the statute "could have had no purpose but to clarify and enlarge the Board's power in dealing with surcharges of that nature." This contention is fully answered in Plainfield Union Water Company v. Board of Public Utility Commissioners, supra, 117 N.J.L. 18 (Sup. Ct. 1936), a case involving the quoted statute. There the court had under review an order of the Board of June 5, 1935, directing the public utility to repay an amount found by the Board to have been, to quote the Board's order, "`without warrant or justification exacted by way of surcharge from the City by the company.'" (Italics supplied.) It is thus apparent on the face of the order of the Board that the controversy did not arise in a rate case under the purported authority of the Hackensack case. If there be any doubt on this point, it is set at rest by the opinion of the court. The public utility claimed that
"the payments were voluntarily made. The board at the hearing refused to go into this question, and properly as we think; for its function was limited by the statute and did not include defenses to a recovery which would naturally be for the determination of a court and jury, or in proper cases, a court of equity." (117 N.J.L. at page 20)
The payments having been voluntarily made, they were manifestly not of the kind contemplated by the Hackensack decision.
It is important, too, to observe that in the Plainfield Union case the court, following the earlier decision of National Radiator Company v. Pennsylvania Railroad Company, 6 N.J. Misc. 778, 781 (Circ. Ct. 1928), and in line with an *96 earlier ruling of the Board, Flanagan v. Hackensack Water Company, P.U.R. 1933 B., p. 395, conceded the contention of the public utility that the Board had no statutory power to order a repayment until the passage of the statute. This situation discloses still another defect of the Hackensack decision; under it a public utility might collect a surcharge by appropriate proceedings before the Board, but the Board, until the 1935 statute was passed, could not compel a refund from the company.
There are, moreover, other grounds for holding R.S. 48:2-29.3 ineffective. R.S. 43:2-21 sets forth the fundamental powers of the Board relating to rate-making. The Board, after hearing upon notice, "may * * * fix just and reasonable * * * rates." In every such proceeding the Board "shall complete and close the hearing and enter its final order within six months." "When any public utility shall increase any existing * * * rates * * * or change or alter any existing classification, the board * * * shall have power after hearing, upon notice, * * * to determine whether the increase, change or alteration is just and reasonable." The Board may suspend the change up to three months and if need be for an additional three months. "The Board shall approve the increase, change or alteration upon being satisfied that the same is just and reasonable." With R.S. 48:2-21 is to be read L. 1935, c. 49 (R.S. 48:2-21.1 (supra)), authorizing the Board during the pendency of a rate proceeding "or at any other time" to "negotiate and agree with any public utility" for an adjustment of rates either for a specified term or otherwise. "In no event shall any such adjustment be regarded as contractual," but they shall be subject to proceedings provided for in the public utility laws or under this section. R.S. 48:2-21.1 read with R.S. 48:2-21 is the legislative answer to the doctrine of the "experimental rate" enunciated in the Hackensack case.
These statutes taken together present a complete statutory program of rate-making designed to produce speedy determinations by the Board, with ad interim relief if necessary, *97 obviating any resort to the doctrine of the Hackensack case. These statutes embody principles of rate-making fundamentally at variance not only with the Hackensack case but also with the application of R.S. 48:2-29.3, supra, sought by the company, for these statutes look forward in rate-making in consonance with the pertinent decisions of the United States Supreme Court whereas the Hackensack case, and R.S. 48:2-29.3 under the application sought by the company, look backward. It is on the basis of these statutes that all of the rate-making cases in this court in recent years have been decided; see In Re New Jersey Power & Light Co., supra, 9 N.J. 498, New Jersey Bell Tel. Co. v. Department of Public Utilities, Board of Pub. Utility Com'rs, supra, 12 N.J. 568.
The company cites no case where R.S. 48:2-29.3 has been applied to surcharges to recoup past deficits in returns. Rather has it been applied to cases where temporary increases or surcharges have been allowed pending final determination of a rate case under R.S. 48:2-21.1, supra.
Not only did the company not avail itself of any application for temporary rates under R.S. 48:2-21.1, but the sources of deficiency in income claimed by it and disclosed to the Board such as increases in federal income taxes, loss due to a severe ice storm in January 1953, increases in wages, costs and interchange (see In Re New Jersey Power & Light Co., supra, 9 N.J. 498, 530) and their effect on its own calculated rate base in 1951, 1952 and 1953 appear related to the Board's order and all could have been met by application for temporary rates under R.S. 48:2-21.1, supra. We therefore cannot agree with the company's contention that "recoupment of deficits by surcharging the already established just and reasonable rates is the only effective remedy available to the Company." R.S. 48:2-29.3 under the construction urged by the company is clearly inconsistent insofar as recoupment of past deficits by fresh surcharges is concerned with R.S. 48:2-21.1, which provides for temporary relief in rate proceedings under R.S. 48:2-21. By reason of such inconsistency it must be disregarded with respect to applications *98 to recoup past deficits by surcharges. Such has been the course in all recent rate cases in this court; In Re New Jersey Power & Light Co., supra, 9 N.J. 498; New Jersey Bell Tel. Co. v. Department of Public Utilities, Board of Public Utility Com'rs, supra, 12 N.J. 568.
Any difficulties with respect to deficits of anticipated income in 1951, 1952 or the first five months of 1953 (there was, of course, no real deficit during this period in the sense of the company making no profit) are due to the failure of the company to pursue its available statutory remedies. On November 21, 1950 it stipulated that it would not place the rates filed on June 26, 1950 in operation until March 15, 1951 without the prior approval of the Board. From April 27, 1951 when the Board denied its application for increased rates to May 26, 1952, when its appeal to the courts was decided upholding the earlier determination of the Board, it failed to resort to R.S. 48:2-21.1. From May 26, 1952 to October 18, 1952 it failed to file new schedules of rates. From October 16, 1952 to May 13, 1953, when the Board approved new rates effective June 1, 1953, it again failed to resort to R.S. 48:2-21.1.
For the reasons herein stated, the order of the Board dismissing the company's application for a surcharge is affirmed.
For affirmance  Chief Justice VANDERBILT, and Justices HEHER, BURLING and BRENNAN  4.
For reversal  Justice OLIPHANT  1.