843 A.2d 1153 (2004)
367 N.J. Super. 487
PENPAC, INC., Plaintiff-Appellant/Cross-Respondent,
v.
PASSAIC COUNTY UTILITIES AUTHORITY, Defendant-Respondent/Cross-Appellant.
In the Matter of the Petition of the Passaic County Utilities Authority for a Declaratory Ruling Regarding the Continuing Obligation of Penpac, Inc., to Provide Transfer Station Services and Rates for Services.
Superior Court of New Jersey, Appellate Division.
Submitted January 21, 2004.
Decided March 11, 2004.
*1154 *1155 Robert J. Beacham, Hillsborough, attorney for appellant/cross-respondent.
McManimon & Scotland, attorneys for respondent/cross-appellant Passaic County Utilities Authority (Jeffrey G. Kramer, Newark, of counsel and on the brief).
Peter C. Harvey, Attorney General, attorney for respondent Department of Environmental Protection (Andrea M. Silkowitz, Assistant Attorney General, of counsel; Susan J. Vercheak, Deputy Attorney General, on the brief).
Before Judges STERN, LEFELT and PAYNE.
The opinion of the court was delivered by LEFELT, J.A.D.
PENPAC, Inc., a New Jersey public utility, provided solid waste transfer station operations and transportation services for the Passaic County Utilities Authority (PCUA). PENPAC appeals and PCUA cross-appeals from the final decision of the Commissioner of the Department of Environmental Protection (DEP) awarding PENPAC $3,238,792 as compensation for an under-recovery incurred through interim rates PENPAC had been authorized to charge PCUA for its services from 1993-96. The appeal and cross-appeal present the following six issues: (1) whether the initial decision of the Administrative Law Judge (ALJ) should be deemed adopted because the DEP Commissioner issued a summary order and then delayed over one year before issuing the final decision; (2) whether administrative precedence or the prohibition against retroactive ratemaking precludes interest on the under-recovery award; (3) whether the Commissioner erred by adopting the "operating margin" rate setting methodology instead of the "base rate/rate of return" with an operating reserve; (4) whether the Commissioner *1156 erred by adopting a 26.44% operating margin; (5) whether the Commissioner erred by failing to make certain adjustments when determining PENPAC's cost-of-services; and (6) whether the Commissioner erred by failing to reopen the matter to consider the sale of PENPAC in August 1998. We affirm the Commissioner on issues (1) and (3) through (6). On issue (2), we conclude that the Commissioner should have awarded limited prejudgment interest to PENPAC. Consequently, we remand for an interest determination. We also note that PENPAC performed services for PCUA until November 1997, when the parties ceased doing business with each other, and the Commissioner's award appears to end in 1996. Thus, on the remand the Commissioner must also consider whether the under-recovery award should be extended through November 1997.

I.
We first summarize the facts and procedural history. The PCUA was responsible for implementing the Passaic County District Solid Waste Management Plan. From April 10, 1987 to December 12, 1992, PCUA contracted with PENPAC to provide solid waste transfer station operations and transportation services to PCUA for a fixed price per ton of municipal waste, which was established through the competitive interactions of the market place. PENPAC's only solid waste customer was PCUA.
The Board of Public Utilities (BPU) had initially approved the contract between PENPAC and PCUA, pursuant to the Solid Waste Utility Control Act, N.J.S.A. 48:13A-1 to -7, but in August 1991, the Legislature transferred jurisdiction over solid waste from BPU to the Department of Environmental Protection (DEP). N.J.S.A. 13:1D-1 (Reorganization Plan No. 002-1991). Thus, after August 1991, PENPAC and PCUA came under the regulatory supervision of DEP.
Pursuant to the contract, private companies and municipalities that collected solid waste within Passaic County would deliver the waste to one of PENPAC's transfer stations. From the stations, the waste was transferred to tractor-trailers for disposal at out-of-state landfills.
As the end of its contract with PENPAC drew near, PCUA requested bid proposals to handle the district's solid waste disposal needs after the contract with PENPAC expired. After reviewing the bids, PCUA applied for DEP approval of a proposed contract with A.J.R. Enterprises, Inc., so that PCUA could transfer responsibility for solid waste transportation services from PENPAC to A.J.R. Enterprises. PCUA also sought approval from DEP to have PENPAC continue to provide solid waste transfer station services.
After PENPAC's contract had expired and until PCUA's contract with A.J.R. Enterprises was approved in June 1993, DEP directed PENPAC to continue to provide all solid waste services to PCUA, including transportation services, at interim rates, subject to adjustment. After June 1993, when A.J.R. Enterprises began providing transportation services, DEP approved a series of interim rates, also subject to adjustment, for the remaining solid waste services that PENPAC continued to provide. PENPAC thus continued to provide its services to PCUA, after termination of its written contract, well into 1997 based upon a series of interim rates that were adjusted from time to time, but never made permanent.
In January 1993, before approval of the A.J.R. Enterprise contract, and in September 1994, after PENPAC's services had been reduced, DEP transferred the question of PENPAC's rates to the Office of Administrative Law for a hearing on the *1157 appropriate permanent rates for 1993, 1994, and 1995 and the setting of a new interim rate for 1996 and prospectively.
At the time of the lengthy hearings, conducted on various dates between November 1996 and May 1997, the ALJ and the parties assumed that interim and permanent rates for PENPAC were the only issues. After all witnesses had testified, however, PENPAC and PCUA terminated their relationship. At that point, the issues morphed into whether PENPAC suffered an under-recovery or over-recovery for the services performed during the period in question, which encompassed only the period PENPAC operated under interim rates and included none of the years that PENPAC's operations were controlled by the written contract.
The ALJ's initial decision recommended that DEP order PCUA to compensate PENPAC in one lump sum of approximately 7.7 million dollars for an underrecovery from 1993 through 1997. The parties filed their exceptions to the initial decision with the DEP Commissioner. Pursuant to N.J.S.A. 52:14B-10(c) and N.J.A.C. 1:1-18.8, the Commissioner applied for and was granted nine forty-five-day extensions to prepare the final decision.
The final resolution was so delayed that PENPAC filed an order to show cause in the Law Division, seeking to enforce the ALJ's initial decision as the agency's final decision. Shortly thereafter, four days before the last extension would have expired, the Commissioner issued a "Summary Order" in which he outlined the modifications he would make to the initial decision and indicated that a final decision would follow "in the near future."
Over one year after the "Summary Order," and less than one day before the order to show cause was to be heard in the Law Division, the Commissioner issued the final decision, re-affirming his summary order that PENPAC's operating margin should be 26.44%, which resulted in an under-recovery of $3,238,792.
PENPAC appealed and PCUA crossappealed to the Appellate Division from the Commissioner's final decision, and the Law Division transferred PENPAC's pending order to show cause to us pursuant to R. 1:13-4.

II.
In the following sections, we deal with each issue raised by the parties on the appeal and cross-appeal. We start with whether the ALJ's initial decision should have been "deemed adopted." The Administrative Procedure Act (APA), N.J.S.A. 52:14B-1 to -25, requires an agency head to issue its final decision within 45 days of receipt of the ALJ's initial decision, unless the time period is extended by the Director of the Office of Administrative Law (OAL) for good cause. N.J.S.A. 52:14B-10(c). If the agency head fails to issue the agency's final decision within the allotted time, the ALJ's initial decision is "deemed adopted" as the final decision of the agency. Ibid.
In this case, the ninth and last extension that the Commissioner obtained was to end on July 9, 2000. On July 5, the Commissioner issued the "Summary Order," in which he outlined, without setting forth any real factual or legal basis, the modifications that he would make to the ALJ's initial decision.
The summary order stated that the Commissioner would be issuing a "more detailed Decision and Order in this matter in the near future, which will provide a full discussion of the issues as well as the reasoning for the Department's determinations." DEP also made clear subsequently that the order was not final and the parties' time for appeal would run from the final decision. Over one year later, on *1158 August 16, 2001, the Commissioner issued the more detailed final decision, reaffirming his summary order.
PENPAC argues that the APA does not contemplate the process followed by the Commissioner and contends that the ALJ's initial decision became the final decision by operation of N.J.S.A. 52:14B-10(c). However, the statute does not specifically preclude the issuance of a summary order. Ibid. Indeed, the OAL's implementing Uniform Administrative Procedure Rules not only permit the 45-day period to be extended, N.J.A.C. 1:1-18.8, but also permit the agency head to "enter an order or a final decision." N.J.A.C. 1:1-18.6(a). Nevertheless, the agency's final decision must contain findings of fact and conclusions of law supporting any rejection or modification of the ALJ's initial decision. N.J.S.A. 52:14B-10(c).
We have previously indicated that the "deemed adopted" provision of N.J.S.A. 52:14B-10(c) should not be applied when a timely though cursory announcement rejecting an ALJ's decision was followed almost two months later by more specific findings and conclusions. DiMaria v. Bd. of Trs. of Pub. Employees' Ret. Sys., 225 N.J.Super. 341, 347, 542 A.2d 498 (App. Div.), certif. denied, 113 N.J. 638, 552 A.2d 164 (1988); Steinmann v. State, Dep't of Treasury, 235 N.J.Super. 356, 360, 562 A.2d 799 (App.Div.1988), rev'd on other grounds, 116 N.J. 564, 562 A.2d 791 (1989) (approved a short timely decision "stated on the record" followed in two months by a written final decision); see In re Pub. Serv. Elec. & Gas Co.'s Rate Unbundling, Stranded Costs & Restructuring Filings, 330 N.J.Super. 65, 91, 748 A.2d 1161 (App.Div.2000), aff'd, 167 N.J. 377, 771 A.2d 1163 (2001) (noted that BPU had issued a "summary order" followed four months later by a "Final Decision and Order").
"[T]he lack of findings of fact and conclusions of law in an agency's [summary order preceding its final decision] does not automatically require the ALJ's initial decision to be `deemed approved.' " Capone v. N.J. Racing Comm'n, 358 N.J.Super. 339, 341, 817 A.2d 995 (App. Div.2003). But, "we have also stated that an agency decision issued without findings of fact and conclusions of law does not conform with the APA and that an unjustifiable delay in satisfying this requirement could result in the ALJ's initial decision being transformed into the agency's final decision." Ibid.
The over one-year delay in this case between the summary order and final decision is much longer than the four-and-one-half and seven-and-one-half month delays in the two consolidated racing cases that were involved in Capone. In Capone, however, both of the administrative hearings took less than a day, the records were small, and the issues simple. Id. at 349-50, 817 A.2d 995. That is not the case here.
In this matter, we cannot find that DEP proceeded in bad faith, or was inexcusably negligent or grossly indifferent. King v. N.J. Racing Comm'n, 103 N.J. 412, 421, 511 A.2d 615 (1986). The Commissioner explained in his summary order that the nine extensions were sought to review the "voluminous record and [to analyze] this matter in light of subsequent developments in the management of solid waste in New Jersey as a result of the decision ... in [Atl. Coast Demolition & Recycling, Inc. v. Bd. of Chosen Freeholders of Atl. County, 112 F.3d 652, 667 (3d Cir.), cert. denied sub nom., Essex County Utils. Auth. v. Atl. Coast Demolition & Recycling, Inc., 522 U.S. 966, 118 S.Ct. 412, 139 L.Ed.2d 316 (1997), amended, 135 F.3d 891 (3d Cir.1998) ]," which found New Jersey's waste flow system and its regulations unconstitutional.
*1159 Although the Commissioner has not explained the cause of the delay between issuing his summary order and the final decision, we note that the subject matter of this administrative proceeding is very complex, there were many days of complicated testimony, and there was a voluminous record, which was made even more problematical by the parties' ending their relationship after the hearings.
After the Atlantic Coast Demolition & Recycling, Inc. decision in 1997, as the Commissioner noted in his summary order, "there was no longer a flow of waste which was required to be delivered to the [PENPAC] facilities. PCUA lost the flow of waste and therefore the income upon which it depended to pay its administrative, operational and debt costs. [PENPAC] was freed to become a participant in the general solid waste market, with many customers rather than one, and the parties ceased to do business with one another."
Moreover, there is no indication that the course DEP pursued in this matter was other than an isolated event precipitated by the complexity and unusual nature of this matter. There is no evidence in the record that DEP is "repeatedly crafting its own procedure in derogation of statutory standards." Chapel v. Bd. of Trs. of Pub. Employees' Ret. Sys., 258 N.J.Super. 389, 398, 609 A.2d 1294 (App.Div.1992).
It is also clear to us that the Commissioner believed that the summary order discharged DEP's obligations under N.J.S.A. 52:14B-10(c). While this was a mistake, as we immediately explain below, and our concerns regarding the extraordinary unexplained delay that ensued continue, we cannot conclude in this complicated solid waste atypical ratemaking proceeding that the initial decision should be "deemed adopted."
We do note, for future guidance, that it was not proper for the agency to fail to seek further extensions from the OAL after issuing a summary order that did not qualify under the APA as a final decision. The last sentence of N.J.S.A. 52:14B-10(c), provides that "[f]or good cause shown, upon certification by the director and the agency head, the time limits established herein may be subject to extension." As Judge Skillman explained in Capone, this sentence "clearly contemplates that any extension of the forty-five day period for issuance of a final agency decision shall be under the supervision and control of the Director of the OAL." Capone, supra, 358 N.J.Super. at 350-51, 817 A.2d 995. The summary order issued in this case did not meet the requirements of the APA for a final agency decision. Consequently, the Commissioner should have continued to request extensions from the OAL Director for the entire period until issuance of a final decision that met the APA requirements.
In this way, a record will be developed for future cases so that a more accurate determination can be made as to the reasons for agency delay in issuing a final decision. Had the extension process been adhered to in this case, our questions as to the precise reasons for this delay could have been easily satisfied. It should no longer be required for this court to intuit an agency's motivation for perpetrating an extraordinary delay.

III.
PENPAC also contends that the Commissioner erred by not awarding interest on the under-recovery. The ALJ disallowed interest on PENPAC's under-recovery by finding that such interest would constitute unlawful retroactive ratemaking. The Commissioner disallowed interest based on "the historic practice of the Department," without citing any specific examples. We do not find either of these rationales completely satisfying.
*1160 Utilities in New Jersey may not recover revenue deficiencies caused by an insufficiency of their prior rates. N.J.S.A. 48:2-21; In re Petition of Elizabethtown Water Co., 107 N.J. 440, 452, 527 A.2d 354 (1987). Ratemaking is "necessarily present and prospective." In re Petition of Elizabethtown Water Co., supra, 107 N.J. at 453, 527 A.2d 354. When rates are set too low, the normal relief is to raise rates prospectively. In re Proposed Increased Intrastate Indus. Sand Rates, 66 N.J. 12, 23, 327 A.2d 427 (1974). It is not permitted to attempt to recoup past deficits by way of a surcharge on present rates. N.J. Power & Light Co. v. State Dep't of Pub. Util. Comm'rs, 15 N.J. 82, 93, 104 A.2d 1 (1954). Ratemaking should not "look both forward and backward." Id. at 92-93, 104 A.2d 1.
In In re Petition of Elizabethtown Water Co., a public water company had applied for a $9.2 million increase to its base rates for the 1984 operating year. Supra, 107 N.J. at 443, 527 A.2d 354. BPU agreed to the increase, but ordered a postponement of the effective date in order to offset the $1.15 million over-earnings that had resulted from a drought during the prior years. Id. at 443, 445-46, 527 A.2d 354. The Court declared that this was retroactive ratemaking, and then found that "this kind of retroactive ratemaking is prohibited." Id. at 442-43, 449, 527 A.2d 354. Retroactive ratemaking is only permissible in certain narrowly defined "statutorily authorized" situations. Id. at 451, 527 A.2d 354.
In this matter, PENPAC was directed to continue operating, after its written contract expired, for over four years on "interim rates," which were subsequently found insufficient. Interim rates, set under N.J.S.A. 48:2-21.1, are not permanent or binding, In re Petition of Elizabethtown Water Co., supra, 107 N.J. at 451, 527 A.2d 354, and, in this case, were set without a full analysis of PENPAC's operation and without a hearing. See In re Proposed Increased Intrastate Indus. Sand Rates, supra, 66 N.J. at 25, 327 A.2d 427. The rates were specifically subject to future adjustment and would be subject to refund if determined to be excessive. In re Revision of Rates Filed by Toms River Water Co., 82 N.J. 201, 212, 412 A.2d 430 (1980).
Unless there is specific statutory authorization, retroactive ratemaking occurs when rates are established that permit a utility to recover past losses or that require the utility to refund excess profits. In re Petition of Elizabethtown Water Co., supra, 107 N.J. at 448, 527 A.2d 354. "[R]etroactive ratemaking is impermissible regardless of whether it favors the utility or the ratepayers." Id. at 449, 527 A.2d 354.
To recover past losses, a rate would be surcharged that could only have been set, under the statute, if the agency determined it to be "just and reasonable." N.J.S.A. 48:2-21(b); N.J.S.A. 48:13A-7; N.J. Power & Light Co., supra, 15 N.J. at 92, 104 A.2d 1. A surcharge on a just and reasonable rate could not only render the rate confiscatory but would also be beyond the power of the regulatory agency and place an unjust burden on present consumers of the utility's services. NJ Power & Light Co., supra, 15 N.J. at 91-92, 104 A.2d 1.
Because the parties ceased doing business together in this matter, however, no future rate was needed or possible. The Commissioner found "because the parties are no longer doing business with one another, and, in fact, one party no longer does business at all, there is no need to set a rate going forward. Rather it is only necessary to determine the amount of any underrecovery or overrecovery."
*1161 Neither party takes the position that the under-recovery award, found by both the ALJ and Commissioner, constitutes retroactive ratemaking. "What we basically have here is an administrative response to an extraordinary and nonrecurring set of circumstances." In re Petition of Elizabethtown Water Co., supra, 107 N.J. at 461, 527 A.2d 354 (O'Hern, J. dissenting). The unique circumstances of this case do not preclude the under-recovery award because while ratemaking principles were utilized to reach the final decision, this was not retroactive ratemaking as no rate to be applied prospectively was established. Accordingly, if the lump sum under-recovery award, in this circumstance, does not violate the retroactive ratemaking preclusion, then neither would interest on the award.
Therefore, we turn to the historical precedent argument, to determine whether the Commissioner correctly precluded interest on this basis. As we have already indicated, the matter at hand, is not the typical ratemaking proceeding, and the Commissioner has not cited to any prior determination in support of his conclusion. This case includes several years of interim rates followed by a cessation of business between the utility and the ratepayer and an extraordinary delay between the initial decision and final decision. This is quite novel and cannot be compared easily with prior ratemaking proceedings involving under-recoveries, or at least any our research could disclose. Thus, we do not believe that either the retroactive ratemaking preclusion or historical precedent justifies rejection of interest on the underrecovery.
We have, however, previously concluded that a solid waste utility was not entitled to pre-judgment interest on an amount awarded to it for landfill taxes and tonnage shortfall adjustments over the length of its contract with the county. In re Petition of County of Essex (1) For Approval of Continuation of Interim Solid Waste Disposal Rates; and (2) For Approval of a Cubic Yard Conversion Ration of 3:1, 299 N.J.Super. 577, 598, 691 A.2d 846 (App. Div.), certif. denied, 151 N.J. 463, 700 A.2d 876 (1997), cert. denied, 522 U.S. 1111, 118 S.Ct. 1043, 140 L.Ed.2d 108 (1998). We made clear that the denial of interest was particularly appropriate "where, in the absence of an overriding equity, a governmental agency would be called upon to pay the interest." Id. at 598, 691 A.2d 846.
We have also made clear that "[w]here the debtor is a governmental agency and interest in the cause is not provided for by statute, particular circumspection in the granting of pre-judgment interest is required and a showing of overriding and compelling equitable reasons must be made in order to justify the award." Bd. of Educ. of the City of Newark v. Levitt, 197 N.J.Super. 239, 244, 484 A.2d 723 (App.Div.1984).
PENPAC seeks interest for the entire delay from the ALJ's initial decision until the final decision. We do not believe that pre-judgment interest is appropriate for the period up to the date the summary order was issued. The delay until the summary order can be directly attributed to the complexity of the lengthy proceeding and the parties' cessation of their business relationship.
PENPAC, however, also seeks pre-judgment interest based on the Commissioner's extraordinary delay in issuing the final decision. Here, we agree with PENPAC. Essentially, PENPAC is advocating for "delay damages." In DeSai v. Bd. of Adj. of Phillipsburg, 360 N.J.Super. 586, 824 A.2d 166 (App.Div.2003) (quoting the unpublished decision in DeSai v. Bd. of Adjustment of the Town of Phillipsburg, A-1144-99T3 (June 27, 2001)), we declared that " `[d]elay damages are generally awarded where there is evidence of an *1162 unreasonable delay fairly attributable to the governmental authority responsible for the granting of the permission requested.' "Of course, the delay in this case was not caused by PCUA, yet it will be the PCUA and not the DEP that will be required to pay any "damages" awarded PENPAC.
But the delay by DEP in issuing the final decision was quite lengthy, and though we cannot ascribe bad faith to the agency, we also recognize that DEP failed to obtain the required extensions from the OAL Director and never explained why, even considering the complexities involved, it required more than a year to explicate the summary order. And most significantly, DEP's delay inured to the benefit of PCUA, who retained over three million dollars that according to the summary order should have been paid to PENPAC.
"Prejudgment interest has been awarded against public entities in appropriate situations." See Fasolo v. Div. of Pensions of N.J., 190 N.J.Super. 573, 587, 464 A.2d 1180 (App.Div.1983) (suit for reimbursement of overpayments made to the Public Employees' Retirement System). See also Emerick v. Teaneck Bd. of Educ., 221 N.J.Super. 456, 464-65, 534 A.2d 1044 (App.Div.1987) (court declined to interfere with the trial judge's award of prejudgment interest against a public entity, noting that "[d]efendant had the use of plaintiff's money for the interim period....").
"The `equitable purpose of prejudgment interest is to compensate a party for lost earnings on a sum of money to which it was entitled, but which has been retained by another.'" N. Bergen Rex Transport, Inc. v. Trailer Leasing Co., 158 N.J. 561, 574-75, 730 A.2d 843 (1999) (quoting Sulcov v. 2100 Linwood Owners, Inc., 303 N.J.Super. 13, 39, 696 A.2d 31 (App.Div.), certif. granted, 152 N.J. 10, 702 A.2d 349 (1997), appeal dismissed, 162 N.J. 194, 743 A.2d 847 (1999)); see also, Pressler, Current N.J. Court Rules, comment 8 on R. 4:42-11 (2003) ("[P]rejudgment interest is not a penalty but rather its allowance simply recognizes that until the judgment is entered and paid, the defendant has had the use of money rightfully the plaintiff's.").
We have concluded that this rather atypical rate case, with an extraordinary delay between a summary order that directs a substantial payment and is subsequently confirmed, without any modification, by a final decision, requires the imposition of interest from the date of the summary order until the date of the final order. In this way PENPAC is compensated for being deprived of the monies allotted to it in the summary order, and the PCUA is required to relinquish the benefit it has obtained by the use of these funds during the delay. No other interest award is equitably warranted.

IV.
Both PENPAC and PCUA agreed that a traditional rate base/rate of return methodology was not appropriate for PENPAC for the post-contract years, but they disagreed as to what methodology was proper. PCUA argues the Commissioner erred by selecting the operating margin methodology instead of a rate base/rate of return methodology with an operating reserve. Both parties also claim that the Commissioner erred by selecting the appropriate operating margin and by failing to set forth sufficient findings of fact and conclusions of law to support the decision. PENPAC advocates for the ALJ's findings, while PCUA argues that an overrecovery instead of an under-recovery occurred. We reject all of these arguments.
Before explaining rate base and operating margin methodologies, we first reject the argument that the Commissioner *1163 failed to set forth sufficient findings of fact and conclusions of law. The ALJ issued a sixty-seven page initial decision. The Commissioner issued a twenty-four page decision adopting the ALJ's analysis almost entirely. In reaching that decision, the Commissioner carefully set forth the parties' arguments and considered their assertions. When the agency head adopts an ALJ's findings, it is not necessary for the agency head to address every aspect of the ALJ's decision. In re Petition of Pub. Serv. Elec. & Gas Co., 304 N.J.Super. 247, 265, 699 A.2d 1224 (App.Div.), certif. denied, 152 N.J. 12, 702 A.2d 351 (1997).
The Commissioner's one significant modification was to the ALJ's actual operating margin, and the Commissioner explained the modification in detail. This was not a cavalier rejection, similar to the one we criticized in In re Bergen County Utils. Auth., 230 N.J.Super. 411, 416-17, 553 A.2d 849 (App.Div.1989).
The general rate-setting statute is silent on any required methodology to establish "just and reasonable" utility rates. N.J.S.A. 48:2-21. Here, the competing methodologies were a modified rate base/rate of return with an operating reserve and the operating margin.
Rate base is defined as " `the fair value of the property of the public utility that is used and useful in the public service.' " In re Petition of Jersey Cent. Power & Light Co., 85 N.J. 520, 529, 428 A.2d 498 (1981) (quoting In re Petition of Pub. Serv. Coordinated Transport, 5 N.J. 196, 217, 74 A.2d 580 (1950)). The rate base/rate of return methodology requires examination of the utility's property valuation (which constitutes its "rate base"), expenses (including income taxes and an allowance for depreciation), and the rate of return developed by relating its income to its rate base. In re Petition of Jersey Cent. Power & Light Co., supra, 85 N.J. at 529, 428 A.2d 498. The rate base/rate of return methodology focuses on the utility's capital amountsi.e., its equityand the rate of return on those amounts to investors.
Rates are set for services in an amount to cover the utilities' expenses plus a return on the shareholders' investment. Stated another way, the rate should be set to allow the public utility to earn a fair return on its rate base, or the property that is used or useful in providing its regulated services. 64 Am.Jur.2d Public Utilities § 98 (2001). An operating reserve, which was suggested by PCUA in addition to the rate base/rate of return, would according to PCUA provide a cash cushion funded by rates in the event unforeseen expenses arise.
In contrast, the operating margin methodology takes into account the total operation and maintenance expenses of the utility and then divides those expenses by the revenues to produce an operating ratio. The difference between the operating ratio and 100% is the operating margin, which is its operating profit. As the ALJ explained, "[t]he operating margin is that percentage of total gross revenues that typically should remain for the payment of depreciation, depletion, amortization, interest, income taxes, and net profit from operations."
For example, if we assume a utility with $1,000,000 of operating revenues and $900,000 in operating expenses, to find the operating margin, we divide the operating revenues into the operating expenses and get a 90% operating ratio. Thus, we need ninety percent of the operating revenues to cover the utility expenses. The operating margin, or profit, would be 10%.
The operating margin methodology does not focus on the return on or of invested capital. Rates are based on the fluctuations of costs and revenues, and the number *1164 of shareholders or investors is irrelevant.
In this case, the ALJ and Commissioner both rejected the rate base/rate of return methodology in favor of the operating margin methodology, which was applied in New Jersey and reviewed by our courts as early as 1986. Parks v. Tenants Ass'n of Holly Hill Mobilehome Terrace, 213 N.J.Super. 511, 518, 517 A.2d 1192 (App.Div.1986), aff'd as modified on other grounds sub nom. Parks v. Rent Control Bd. of Hazlet Tp., 107 N.J. 217, 526 A.2d 685 (1987). We cannot conclude that the adoption of the operating margin methodology was error.
There are circumstances provided by the utility rate setting legislation when a rate base need not be found. N.J.S.A. 48:2-21.2. When determining a just and reasonable rate for a utility like PENPAC, it is not necessary to calculate a rate base when "the gross operating revenue of the public utility, computed on the basis of the 12 months next preceding the month in which the proceeding is initiated, exceeds the depreciated book costs of its property used and useful in its business as a public utility." N.J.S.A. 48:2-21.2(b). There is sufficient evidence in the record to support the findings of both the ALJ and Commissioner that PENPAC falls within this exclusion.
In addition, there was ample expert evidence in the record upon which the Commissioner and ALJ could rely to justify selecting the operating margin over the rate base/rate of return methodology. This testimony noted that the operating margin methodology was the better choice because PENPAC's operation was laborintensive, rather than capital intensive. The evidence contrasted this methodology with the traditional rate base/rate of return methodology, which is better suited to more traditional, capital-intensive utilities unlike PENPAC. While PCUA claims that if "accounting fictions" are disregarded, PENPAC was in fact a capital intensive business, the ALJ and the Commissioner were free to rely on PENPAC's audited financial statements to support their conclusions that PENPAC was not a capital intensive business and that its revenues exceeded the book cost of its property for all of the years in question. "As a reviewing court, we will not weigh the evidence, determine the credibility of witnesses, draw inferences and conclusions from the evidence, or resolve conflicts therein." De Vitis v. N.J. Racing Comm'n, 202 N.J.Super. 484, 489-90, 495 A.2d 457 (App.Div.), certif. denied, 102 N.J. 337, 508 A.2d 213 (1985).
Both PENPAC and, in its crossappeal, PCUA also object to the Commissioner's use of a 26.44% operating margin percentage. PENPAC contends that the Commissioner's reduction of the ALJ's operating margin was not supported by sufficient evidence in the record. PCUA contends that the Commissioner erred by averaging PENPAC's suggested percentage (37%) with PCUA's "operating margin after depreciation of 16.5% for the unregulated overall industry" and the industry standard (25.82%). PCUA argued that, because PENPAC had the protections of utility rate regulation and operated under interim rates since 1992, it was inherently less risky than comparable unregulated businesses. Consequently, its operating margin, according to PCUA, should be even lower than 16.5%.
The Commissioner eliminated the adjustment for risk that the ALJ had considered and adjusted the margin percentage to an average between the operating margins suggested by the parties and the industry standard. The Commissioner noted the imprecision of ratemaking and noted the importance of examining "what makes sense in the particular context." *1165 "Rough splitting of difference between two fairly but not wholly satisfactory rate calculations is a permissible technique in rate making." 73B C.J.S. Public Utilities § 34, at 214 n. 23 (1983). In Ass'n of Am. Publishers, Inc. v. Governors of U.S. Postal Serv., 485 F.2d 768, 773 (D.C.Cir.1973), the federal court noted that "the rough splitting of a difference between two fairly but not wholly satisfactory rate calculations is a familiar permissible technique.... Since Solomon's day, to split the difference or to come close thereto has been thought wise...."
We are nevertheless reluctant to approve averaging as an appropriate decision-making rationale. When that technique is employed to reach a decision without any basis in the record, the approach seems arbitrary. Nevertheless, "it is the result reached not the method employed that is controlling. It is not the theory, but the impact of the rate order which counts.... The fact that the method employed to reach that result may contain infirmities is not then important." Fed. Power Comm'n v. Hope Natural Gas Co., 320 U.S. 591, 602, 64 S.Ct. 281, 288, 88 L.Ed. 333, 345 (1944) (citations omitted). And in In re Permian Basin Area Rate Cases, 390 U.S. 747, 767, 88 S.Ct. 1344, 1360, 20 L.Ed.2d 312, 336 (1968) (quoting Fed. Power Comm'n v. Natural Gas Pipeline Co. of Am., 315 U.S. 575, 585, 62 S.Ct. 736, 743, 86 L.Ed. 1037, 1049 (1942)), the Supreme Court stated that a rate within the " `zone of reasonableness' " will not be set aside.
Our Supreme Court has recognized that the DEP "is vested with broad discretion in the exercise of [rate-making] authority." In re Petition of Pub. Serv. Coordinated Transp., supra, 5 N.J. at 214, 74 A.2d 580. A rate order may be set aside only "when it clearly appears that there was no evidence before the board to support the same reasonably." N.J.S.A. 48:2-46. Here, the percentage adopted by the Commissioner was close to the statewide industry average, and the Commissioner agreed with PCUA's witnesses who asserted that PENPAC did not have that much risk and therefore removed, with support in the record, the ALJ's risk factor. Because there were such "discrepancies" in the voluminous record between the amounts presented by the witnesses, "we cannot say the result arrived at by the [DEP] is unsupported by the evidence." Plainfield-Union Water Co. v. Bd. of Pub. Util. Comm'rs of N.J., 6 N.J.Misc. 267, 270, 140 A. 785 (Sup.Ct.1928).

V.
In its cross-appeal, PCUA contends that the Commissioner erred by failing to make certain adjustments in determining PENPAC's cost-of-services. Specifically, PCUA argues that the Commissioner and the ALJ erred by: (1) failing to allocate to ratepayers the 1.59 million of PENPAC's gain from the sale and rental of its trailers, i.e., depreciable property paid for through rates; (2) failing to reduce PENPAC's officer/directors compensation; (3) failing to allocate PENPAC's common costs for servicing utility (i.e., municipal waste) and non-utility (i.e., construction and demolition waste) operations; and (4) failing to move approximately $950,000 of depreciation from 1993 and 1994 (the year taken) to 1992 (the year to which it relates), which allowed a double recovery for depreciation. In addition, as to depreciation, PCUA contends that the Commissioner and ALJ erred by allowing PENPAC to recover depreciation in its operating margin (profit) and not in its operating ratio (expenses).
DEP is charged with fixing "just and reasonable" rates for utility services. N.J.S.A. 48:2-21(b). Courts have traditionally abstained from examining "each *1166 detail" of rate making. In In re Permian Basin Area Rate Cases, supra, 390 U.S. at 767, 88 S.Ct. at 1360, 20 L.Ed.2d at 336 (quoting Fed. Power Comm'n v. Hope Natural Gas Co., supra, 320 U.S. at 602, 64 S.Ct. at 288, 88 L.Ed. at 345), the United States Supreme Court declared: "We are not obliged to examine each detail of the Commission's decision; if the `total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry... is at an end.' " Ratemaking does not admit only one correct result. E.g., Duquesne Light Co. v. Barasch, 488 U.S. 299, 309, 109 S.Ct. 609, 616, 102 L.Ed.2d 646, 653 (1989). "Rather, where there is substantial evidence on all sides of the issues addressed, no findings made or conclusions reached that are based on that evidence and are otherwise within the Board's discretionary authority will be seen to be arbitrary, capricious or unreasonable." In re Application of N.J. Bell Tel. Co., 291 N.J.Super. 77, 89, 676 A.2d 1133 (App.Div. 1996). We must refrain from "titrat[ing]" these cases. Ibid.
While we might not have resolved these issues in precisely the manner in which the ALJ and Commissioner chose, had we heard the evidence, there is adequate support in the record for the Commissioner's decision, and consequently we reject these arguments.

VI.
Finally, PCUA also contends that the Commissioner erred by not reopening the matter to review and take testimony on the August 1998 sale of PENPAC. PCUA claims that PENPAC was sold for $18.1 million, and that its value is highly relevant for rate-setting purposes, assessment of the risk suffered, the value of its assets, and the rate of return on investment. We reject these contentions.
It is well settled that administrative agencies have discretion in deciding whether to reopen a hearing to admit additional evidence before the entry of a final decision. In re Pub. Serv. Elec. & Gas Co.'s Rate Unbundling, Stranded Costs & Restructuring Filings, supra, 330 N.J.Super. at 106, 748 A.2d 1161. There was no abuse of discretion here. We agree with the Commissioner who stated "[w]hether or not PENPAC was able to broker a merger and acquisition in 1998 has no bearing on whether or not there was an underrecovery during the period when PENPAC provided service to the PCUA."

VII.
In conclusion, we affirm the Commissioner's final decision, modifying the ALJ's initial decision and refusing to reopen the record to take testimony regarding the sale of PENPAC. Because we cannot say the rates applied by the Commissioner for the post-contract years were "unjust or unreasonable," we affirm the establishment of a 26.44% operating margin percentage to compensate PENPAC for an under-recovery resulting from its interim rates for 1992 through 1996.
We reverse the refusal to award interest, however, and remand to DEP to award an appropriate amount of interest to compensate PENPAC for the delay that ensued between the summary order on July 5, 2000, and the agency's final decision, on August 16, 2001.
We also note that the final decision covered only 1993 through 1996 even though the parties continued working together until November 1997. Therefore, on the remand, the Commissioner shall also determine whether the under-recovery continued from 1996 until November 1997.
Finally, the transferred order to show cause, which sought to compel the adoption of the initial decision as the agency's final decision, is dismissed as moot.
*1167 Affirmed in part, reversed in part, dismissed in part, and remanded for further proceedings in conformity with this decision.